**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARC A. METHVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>             v.<br><br>GEMINI SPACE STATION, INC., TYLER WINKLEVOSS, CAMERON WINKLEVOSS, DAN CHEN, MARSHALL BEARD, SACHIN JAITLY, JONATHAN DURHAM, JAMES ESPOSITO, and MARIA FILIPAKIS,<br><br>                              Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Marc A. Methvin ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gemini Space Station, Inc. ("Gemini" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Gemini Class A common stock pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about September 12, 2025 (the "IPO" or "Offering"); and/or Gemini securities between September 12, 2025 and February 17, 2026, both dates inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Gemini was founded in 2014 to develop and operate a cryptocurrency ("crypto") platform.

3. Historically, Gemini has primarily generated revenue through transaction, deposit, and other fees charged to users of its crypto platform. Accordingly, in describing the Company's revenue growth strategy, the Offering Documents represented that Gemini was "predominantly focused on expanding [its] exchange platform via increased MTUs [monthly transacting users]"— *i.e.*, unique users who complete at least one transaction on Gemini's platform within a given 30-day period—"increased average daily trading volume, and increasing the number of assets available on [its] platform". The Offering Documents further represented that Gemini would increase MTUs through acquiring new retail and institutional users and expanding internationally.

4. Significantly, the Offering Documents did not disclose any intention to prioritize a prediction market (*i.e.*, a platform enabling users to buy and sell "event contracts" – in effect, instruments wagering on the likelihood of future events).

5.      On August 15, 2025, Gemini filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective on September 11, 2025 (the "Registration Statement").

6.      On September 12, 2025, pursuant to the Registration Statement, Gemini's Class A common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "GEMI".

7.      On September 15, 2025, Gemini filed the prospectus for the IPO on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (together, the "Offering Documents").

8.      Pursuant to the Offering Documents, Gemini issued 15,178,572 shares of the Company's Class A common stock to the public at the Offering price of $28.00 per share for proceeds, before expenses, of $398,437,515 to the Company.

9.      The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Gemini had overstated the viability of its core business as a crypto platform; (ii) Gemini had overstated its commitment to and/or the viability of growing its business through expanding its international operations; (iii) accordingly, Gemini's post-IPO financial and business prospects were overstated; (iv) all of the foregoing raised a non-speculative risk that Gemini was poised for an expensive and disruptive restructuring; and (v) as a result, the Offering

3

Documents and Defendants' public statements throughout the Class Period were materially false and misleading at all relevant times.

10.    On December 10, 2025, Gemini announced that it would launch a prediction market and offer event contracts to its U.S. customers.  At this time, however, the Defendants gave no indication that the Company was poised for an abrupt corporate pivot to a prediction-market-centric business model.

11.    The truth began to emerge on February 5, 2026, when Gemini filed a Regulation FD disclosure on Form 8-K with the SEC, announcing the publication of a blog post authored by Defendants Tyler and Cameron Winklevoss.  In this blog post, the Winklevoss brothers announced a corporate pivot to "Gemini 2.0", describing three dramatic changes to Gemini's operations: (1) Gemini's prediction market would be "more front and center in our experience"; (2) Gemini would reduce its workforce by 25%; and (3) Gemini would exit the United Kingdom, European Union, and Australian markets.

12.    On this news, Gemini's Class A common stock price fell $0.64 per share, or 8.72%, to close at $6.70 per share per share on February 5, 2026.

13.    Then, on February 17, 2026, Gemini issued a Current Report on Form 8-K, announcing the departure of Defendant Marshall Beard, its former Chief Operating Officer ("COO"), Defendant Dan Chen, its former Chief Financial Officer ("CFO"), and Tyler Meade, Gemini's former Chief Legal Officer.  The Company also offered "preliminary unaudited estimates" of its financial results for the fiscal year ended December 31, 2025, including net revenue of $165 million to $175 million and operating expenses of $520 million to $530 million, an increase of approximately 40% from the previous fiscal year.

14.     On this news, Gemini's stock price fell $0.975 per share, or 12.9%, to close at $6.585 per share on February 17, 2026.

15.     On or after February 17, 2026, Defendants updated the live version of the Winklevoss brothers' blog post referenced above, adding language that explicitly tied Gemini's restructuring to the departure of Defendant Chen, Defendant Beard, and Tyler Meade from the Company.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Gemini's Class A common stock was offered and sold, and has traded at all relevant times, on the NASDAQ, which is located in this District.

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

21.    Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired Gemini common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO and/or Gemini securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.    Defendant Gemini is a Nevada corporation with principal executive offices located at 600 Third Avenue, 2nd Floor, New York, NY, 10016.  The Company's Class A common stock trades in an efficient market on the NASDAQ under the ticker symbol "GEMI".

23.    Defendant Tyler Winklevoss, Gemini's Co-Founder, served as the Company's Chief Executive Officer ("CEO") and one of its Directors at all relevant times.

24.    Defendant Cameron Winklevoss, Gemini's Co-Founder, served as the Company's President and one of its Directors at all relevant times.

25.    Defendant Dan Chen ("Chen") served as Gemini's CFO until February 17, 2026.

26.    Defendant Marshall Beard ("Beard") served as a Gemini's COO and one of the Company's Directors until February 17, 2026.

27.    Defendants Tyler Winklevoss, Cameron Winklevoss, Chen, and Beard are collectively referred to herein as the "Exchange Act Individual Defendants".

28.    The Exchange Act Individual Defendants possessed the power and authority to control the contents of Gemini's SEC filings, press releases, and other market communications. The Exchange Act Individual Defendants were provided with copies of Gemini's SEC filings and

press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Gemini, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

29. Gemini and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants".

30. Defendant Sachin Jaitly ("Jaitly") served as a Director of Gemini at all relevant times.

31. Defendant Jonathan Durham ("Durham") served as a Director of Gemini at all relevant times.

32. Defendant James Esposito ("Esposito") served as a Director of Gemini at all relevant times.

33. Defendant Maria Filipakis ("Filipakis") served as a Director of Gemini at all relevant times.

34. Defendants Tyler Winklevoss, Cameron Winklevoss, Chen, Beard, Jaitly, Durham, Esposito, and Filipakis are collectively referred to herein collectively as the "Individual Defendants". Each of the Individual Defendants signed or authorized the signing of the Registration Statement filed with the SEC.

35. As directors, executive officers, and/or major shareholders of the Company, the Individual Defendants participated in the solicitation and sale of Gemini common stock in the IPO

for their own benefit and the benefit of the Company. The Individual Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase the shares sold in the IPO.

36. Gemini and the Individual Defendants are sometimes, in whole or in part, collectively referred to herein as the "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

37. Gemini was founded in 2014 to develop and operate a crypto platform.

38. Historically, Gemini has primarily generated revenue by monetizing its crypto platform through transaction, deposit, and other fees charged to users of its crypto platform. Accordingly, in describing the Company's revenue growth strategy, the Offering Documents represented that Gemini was "predominantly focused on expanding [its] exchange platform via increased MTUs, increased average daily trading volume, and increasing the number of assets available on [its] platform". The Offering Documents further represented that Gemini would increase MTUs through acquiring new retail and institutional users and expanding internationally.

39. Significantly, the Offering Documents did not disclose any intention to prioritize a prediction market.

40. On August 15, 2025, Gemini filed a Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective on September 11, 2025.

41. On September 12, 2025, pursuant to the Registration Statement, Gemini's Class A common stock began publicly trading on the NASDAQ under the ticker symbol "GEMI".

8

42.    On September 15, 2025, Gemini filed the prospectus for the IPO on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

43.    Pursuant to the Offering Documents, Gemini issued 15,178,572 shares of the Company's Class A common stock to the public at the Offering price of $28.00 per share for proceeds, before expenses, of $398,437,515 to the Company.

**Materially False and Misleading Statements Issued in the Offering Documents**

44.    Gemini's Offering Documents described a company whose core business would be a cryptocurrency exchange, stating, *inter alia*:

> Gemini envisions a future where crypto will redesign the global financial system, the internet, and money in a way that provides greater choice, independence, and opportunity for all.  As a trusted bridge between the traditional financial system and the emerging cryptoeconomy, we are providing access for individuals and institutions to a decentralized future that is more open, fair, and secure.

45.    The Offering Documents also described Gemini's cryptocurrency exchange as its "core . . . product", and stated that the Company was founded to be a cryptocurrency exchange, stating *inter alia*:

> Gemini was founded in 2014 to be the most trusted, secure, and easy way to buy, sell, and store crypto assets.  As of July 31, 2025, we serve approximately 549,000 MTUs and approximately 10,000 institutions in over 60 countries, with over $21 billion of assets on our platform, over $285 billion in lifetime trading volume, and over $830 billion in transfers processed on our platform.

> Our core exchange product has expanded over time to become a comprehensive platform for our users to engage with the cryptoeconomy, including a derivatives exchange, staking services, an OTC trading desk, institutional-grade custody, a NYDFS-regulated stablecoin, a U.S. credit card, and a Web3 studio for NFTs.

46.    The Offering Documents did not suggest that Gemini would deviate from its "core exchange product" in the months following the IPO.  Rather, they discussed additional product

offerings as supplementing and helping to diversify Gemini's core product offerings, stating *inter alia*:

> Longer term, we expect to grow and diversify our transaction-based revenue by expanding newly launched products, such as derivatives. We also aim to diversify and broaden the range of assets on our platform, which we anticipate will reduce some of the volatility in our operating results. We further expect growth in non-transaction revenue to contribute to smaller market-based fluctuations in our results.

Although event contracts would qualify as "derivatives," these representations in the Offering Documents gave no indication to investors that such instruments would be anything more than supplemental or peripheral offerings on Gemini's crypto platform, and certainly did not disclose any likelihood that Gemini was just months away from a wholesale corporate pivot into operating a prediction market focused entirely on event contracts.

47.     Furthering the impression that Gemini would not deviate from its "core exchange product", the Offering Documents represented that Gemini's total revenue was primarily comprised of transaction fees generated on its cryptocurrency platform, as they represented over 60% of the Company's total revenue in the first half of 2025 and throughout 2024. The Offering Documents stated, *inter alia*:

> We monetize the products and services offerings on our platform through fees. Fee revenues are predominantly transaction-related fees on trade volume for our exchange and OTC platforms, but also include custody fees, withdrawal fees, credit card fees, and marketplace fees in Nifty Gateway Studio. Our total revenue is largely generated from transaction fees earned on volume-based trades across retail and institutional users. For the six months ended June 30, 2025, exchange revenue represented 63.8% of our total revenue, of which approximately 95% was generated from retail investors, and for the year ended December 31, 2024, exchange revenue represented 67.4% of our total revenue, of which approximately 93% was generated from retail investors.

48.     The Offering Documents also highlighted growing the number of MTUs on Gemini's platform as a key growth strategy for the Company, and described its strategies for

achieving such growth: "To increase MTUs on our platform, we are investing in targeted retail marketing strategies, an expanded institutional sales force, international expansion, and continued product development, all while remaining obsessively focused on improving our product experience . . . ."

49. Providing further detail on the international expansion prong of the Company's growth strategies, the Offering Documents represented that Gemini was "focus[ed]" on the European market, stating *inter alia*:

> *Expand internationally*:  Geographic expansion into new markets and jurisdictions will further amplify our global reach, creating a robust foundation for sustained growth. Crypto is inherently global, and operates 24/7, underpinning our focus on investments in both the European and Asia-Pacific ("APAC") regions.

50. The Offering Documents repeatedly represented that Defendants planned to expand Gemini's international operations.   Even when discussing cautioning investors that their international growth strategy had "uncertain" timing, Defendants did not suggest any likelihood of retreating from this growth strategy – let alone abandoning it entirely just months after the IPO. Rather, the Offering Documents stated, *inter alia*:

> *International Growth*:  By extending our operational footprint into key global markets, we aim to serve the inherently borderless nature of crypto.  In particular, our international expansion plans have focused on obtaining our newly-issued MiCA and MiFID licenses in the E.U., converting the in-principle approval that we obtained from the Monetary Authority of Singapore into a full Major Payments Institution license, offering derivatives products to U.K. high net worth individuals, offering tokenized equities to Gemini users in the E.U., establishing licensed spot and derivatives exchanges in Australia, and establishing licensed spot and derivatives exchanges in Bermuda (intended to serve international users not residing in a jurisdiction where we have a regulated entity).  Our international expansion plans, including the timing thereof, are still being formulated and are uncertain, with the predominant factors guiding such expansion including a region's competitive and regulatory landscape, crypto adoption rates, and unique opportunities that arise. Gemini's intended expansions into Europe and APAC align with the 24/7 trading environment and broaden our reach to users worldwide.

11

51.     While the Offering Documents stated that Gemini planned to launch event contracts as a new product, they did not characterize this initiative as a new strategic direction for the Company.  Rather, the Offering Documents described a prediction market and event contracts merely as some of Gemini's various product offerings, not as products that were likely to become the focus of the Company's business.  The term "prediction market" appears only *once* in the Offering Documents, in a discussion of the potential use cases of "global decentralized finance":

> Crypto market capitalization was over $3.0 trillion as of December 31, 2024, according to CoinGecko. This global decentralized infrastructure scales and supports a diverse range of use cases today, including: . . . *Interoperable financial applications and markets*.   Smart contracts built on blockchain networks unlock programmable financial applications and markets (DeFi) that can be open source, auditable, and natively compatible with other applications built on the network. These smart contract protocols include decentralized asset exchanges, derivative markets, prediction markets, foreign exchange ("FX") markets, secured lending and borrowing, automated market making, and more. (emphasis original)

52.     Similarly, the Offering Documents mention event contracts just *twice*: first, as one of the Company's "upcoming initiatives"; and second, listing "Event Contracts Trading" as one of four new product offerings in development at the Company.

53.     None of the Offering Documents' scant references to prediction markets or event contracts would have suggested to investors that Gemini was just months away from withdrawing from the international markets that it repeatedly described as essential to its future growth as a crypto platform, slashing its headcount by 25%, seeing the departure of three top executives, and reinventing itself as a prediction market.

54.     The Offering Documents also informed investors that Defendants Tyler Winklevoss, Cameron Winklevoss, and Beard each participated in Gemini's Senior Executive Severance Plan, which provided that they would receive substantial compensation if, within three months before or 12 months following a "change of control" such as the IPO, they either resigned

for "good reason" or were terminated without "cause" as the plan defined those terms. Specifically, those Defendants would receive (1) their annual base salaries; (2) their bonuses; (3) accelerated vesting of half of any time- and performance-based equity awards at the greater of target or actual performance; and (4) healthcare continuation benefits for the following 12 months.

55.    Because each of these Defendants enjoyed a substantial base salary, the Company would face a substantial cost if it parted ways with these Defendants in the year following the IPO. As relevant here, Defendant Beard was paid $1,272,500 per year.  His bonus was similarly substantial, as Defendant Beard was eligible to receive a $254,500 bonus.

56.    The Offering Documents similarly informed investors that Defendant Chen was eligible to participate in Gemini's Executive Severance Plan, which provided that he would receive substantial compensation if, within three months before or 12 months following a "change of control" such as the IPO, he either resigned for "good reason" or were terminated without "cause" as the plan defined those terms.  Pursuant to this plan, Defendant Chen would receive (1) 75% of his annual base salary of $730,000, (2) 75% of his bonus, or $109,500; (3) immediate vesting of all time-based equity awards that would have vested through the following nine months; and (4) healthcare continuation benefits for the following 9 months.

57.    None of the foregoing representations signaled to investors that the departure of top Gemini executives was imminent, such that the Company was poised to incur significant compensation-related costs in connection with their exit.

58.    The statements referenced in ¶¶ 44–52, 54–56 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their

preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) Gemini had overstated the viability of its core business as a crypto platform; (ii) Gemini had overstated its commitment to and/or the viability of growing its business through expanding its international operations; (iii) accordingly, Gemini's post-IPO financial and business prospects were overstated; (iv) all of the foregoing raised a non-speculative risk that Gemini was poised for an expensive and disruptive restructuring; and (v) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and misleading at all relevant times.

**Materially False and Misleading Statements Issued During the Class Period**

59.     The Class Period begins on September 12, 2025, when Gemini's common stock began publicly trading on the NASDAQ pursuant to the materially false and misleading statements or omissions contained in the Offering Documents, as referenced in ¶¶ 44–52, 54–56, *supra*, which related to Gemini's purported commitment to international expansion, its post-IPO financial prospects, and the durability of its business model.

60.     On November 10, 2025, Gemini filed a quarterly report on Form 10-Q with the SEC, announcing its financial results for the third fiscal quarter of 2025 ended September 30, 2025, and held a conference call to discuss the same (the Q3 Earnings Call").

61.     During the Q3 Earnings Call, Defendants touted their progress in expanding Gemini's international operations without signaling any likelihood that a change in macro conditions could cause the Company to reverse course in the coming months.  For example, Defendant Cameron Winklevoss said that Defendants' progress on international operations demonstrated that Gemini's business model was sound, stating, *inter alia*[1]:

---

[1] All emphases herein are added unless otherwise indicated.

14

[W]e broadened our global footprint by launching in Australia and securing our MiCA license in Europe, enabling us to offer staking, derivatives and tokenized stocks to customers across the European Union under a regulated framework. *We believe this performance reinforces the strength of our model and the foundation that will continue to power Gemini's long-term growth.*

62. Defendant Tyler Winklevoss discussed Gemini's international expansion efforts in similarly positive terms and gave no hint that Defendants might reverse course in the coming months, stating, *inter alia*: "[i]n Q3, we advanced our mission across 5 key areas that *demonstrate the strength of this model*: one, expanding our regulated global footprint".

63. Also during the Q3 Earnings Call, Defendant Beard discussed Gemini's progress in achieving international expansion through its licensing efforts, including entry into the Australian market (from which it would abruptly withdraw just months later). Among other representations, Defendant Beard stated:

> [W]e made several improvements to the business to further advance our mission and improve our operations. . . . Let me start with our expanding global footprint, where we made important progress in strengthening Gemini's goal of being a trusted regulated partner around the world. We advanced licensing and registrations in key markets when we received our MiCA license from the Malta Financial Services Authority, enabling us to offer certain secure, reliable crypto services across all 30 European countries and jurisdictions. Following the close of Q3, we launched in Australia after obtaining AUSTRAC registration in August and completed key payments integrations to streamline onboarding in the region. . . . Together, these milestones expand Gemini's license footprint across major global markets and strengthen our ability to operate under clear regulated frameworks. They also demonstrate how our commitment to compliance continues to open new opportunities for both retail and institutional customers.

64. Later during the Q3 Earnings Call, Defendant Chen represented to investors that Gemini expected increasing revenues through the form of increased monthly transacting users, stating *inter alia*:

> Looking ahead, our focus remains on driving disciplined growth, improving capital efficiency and maintaining flexibility to invest behind our highest conviction opportunities. Starting with our medium-term framework, we continue to expect monthly transacting users to grow at a 20% to 25% compound rate over the medium

15

term and that growth to be supported by a mix of new retail customers coming through our credit card on exchange and expanding engagement from existing customers across trading, staking and onchain activity.

65.     The statements referenced in ¶¶ 61–64 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that: (i) Gemini had overstated the viability of its core business as a crypto platform; (ii) Gemini had overstated its commitment to and/or the viability of growing its business through expanding its international operations; (iii) accordingly, Gemini's post-IPO financial and business prospects were overstated; (iv) all of the foregoing raised a non-speculative risk that Gemini was poised for an expensive and disruptive restructuring; and (v) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

66.     The truth began to emerge on February 5, 2026, when Gemini issued a Regulation FD disclosure on Form 8-K, announcing it had published a blog post authored by its Co Founders, Defendant Tyler Winklevoss and Defendant Cameron Winklevoss.  In this blog post, attached as an exhibit to the Form 8-K, Defendants announced a corporate pivot to "Gemini 2.0", describing three dramatic changes to Gemini's operations.  First, Defendants wrote that Gemini's recently announced entry into prediction markets would be "more front-and-center in our experience".  Second, they wrote that Gemini would part ways with 25% of its workforce.  Third, Defendants "in order to have the necessary bandwidth to succeed" in the Company's new emphasis on prediction markets, Gemini would "narrow its focus . . . by exiting the UK, EU, and Australian markets."

16

67.    On this news, Gemini's Class A common stock price fell $0.64 per share, or 8.72%, to close at $6.70 per share per share on February 5, 2026.

68.    Following these disclosures, Evercore ISI downgraded the Company's stock from outperform to in line, and reduced its price target 50%, from $15.00 to $10.00, writing that "[o]ver time," Gemini 2.0 "could prove to be 'addition by subtraction', but investors are more interested in growth given the early stage that the company and sector are both in".

69.    Then, on February 17, 2026, Gemini issued a Current Report on Form 8-K, announcing the departure of Defendant Beard, Defendant Chen, and Tyler Meade.  In their respective places, Danijela Stojanovic would serve as Interim CFO, Kate Freedman would assume the role of Interim General Counsel, and Defendant Cameron Winklevoss would handle the COO's revenue-generating responsibilities.  The Company also offered "preliminary unaudited estimates" of its financial results for the fiscal year ended December 31, 2025, including net revenue of $165 million to $175 million and operating expenses of $520 million to $530 million, an increase of approximately 40% from the previous fiscal year.  Gemini attributed this expense figure to "higher personnel-related costs", apparently referring to the departures of Defendant Beard, Defendant Chen, and Tyler Meade, three highly compensated executives: "The estimated increase in operating expenses is primarily due to higher personnel-related costs, including stock-based compensation, and investments in technology, general and administrative expenses and marketing investments to support the Company's strategic initiatives."

70.    On this news, Gemini's stock price fell $0.975 per share, or 12.9%, to close at $6.585 per share on February 17, 2026.

71.    On or after February 17, 2026, Defendants updated the live version of the blog post referenced *supra* ¶ 66, adding language that explicitly tied Gemini's new priority of a prediction

17

market to the departure of Defendant Chen, Defendant Beard, and Tyler Meade from the Company. As of filing, this blog post states: "Update: As part of the Gemini 2.0 transformation, we are making changes to our executive team and will be parting ways with Dan Chen (Chief Financial Officer), Tyler Meade (Chief Legal Officer), and Marshall Beard (Chief Operating Officer)."

72.    In response to Gemini's revelations, several analysts announced reduced price targets for Gemini's common stock.  For example, On February 17, 2026, Truist Securities ("Truist") downgraded Gemini common stock from buy to hold and reduced its price target 46%, from $13.00 to $7.00, expressly citing the Company's drastic headcount reduction, its abrupt exit from international markets, and "this morning's announcement (worse than expected net loss, CFO is leaving, etc.)" – expressly noting that the latter disclosure "could result in more investors becoming concerned about Gemini's solvency".  On February 18, 2026, Needham & Co. reduced its price target 57%, from $23.00 to $10.00, writing that Gemini's February 17, 2026 announcement amounted to "a major leadership restructuring" and "worsened" expenses.  On February 20, 2026, Rosenblatt reduced its price target 55%, from $26.00 to $11.50, writing "[j]ust after what at the time felt like a successful IPO, Gemini is now in full restructuring mode first with significant expense cuts earlier this month and now major [management] changes with the departure of its COO, CFO, and Chief Legal Officer."

73.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Gemini's common stock, Plaintiff and other Class members have suffered significant losses and damages.

**Regulation S-K Item 105**

74.    Throughout the Class Period, Gemini's Offering Documents and periodic financial filings were required to disclose the adverse facts and circumstances detailed above under

18

applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Gemini to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants failed to disclose, *inter alia*, the true scope and severity of the risk that Gemini would be unable to achieve sufficient revenue growth via the strategies it had described to investors, and that there was thus a significant and non-speculative risk that Gemini would be forced to undertake a disruptive and expensive restructuring. Defendants' failure to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

## SCIENTER ALLEGATIONS

75.     During the Class Period, Defendants had both the motive and opportunity to commit fraud. For example, while disseminating the materially false and misleading statements alleged herein to inflate the prices for Gemini securities, Defendant Beard enriched himself by selling 479,901 shares of Gemini common stock, collecting proceeds of approximately $11.8 million.

76.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Indeed, at all relevant times, Defendants represented that Gemini's stated strategies for revenue growth were succeeding, as alleged *supra* ¶¶ 61–64, and did not suggest that Gemini was poised for an expensive and disruptive corporate pivot if or when those strategies failed.

19

77.     In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Gemini common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or Gemini securities during the Class Period; and were damaged upon the revelation of the alleged corrective disclosures (the "Class").  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

79.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Gemini securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Gemini or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

81.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO misrepresented material facts about the business, operations, and management of Gemini;

- whether the Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Gemini to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Gemini securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

83.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

21

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

84.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Gemini securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Gemini securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

85.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

86.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

22

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

87.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.    This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

89.    During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gemini securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Gemini securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

90.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents

23

described above, including statements made to securities analysts and the media that were designed to influence the market for Gemini securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Gemini's finances and business prospects.

91.    By virtue of their positions at Gemini, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

92.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of Gemini, the Exchange Act Individual Defendants had knowledge of the details of Gemini's internal affairs.

93.    The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Gemini. As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with

24

respect to Gemini's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Gemini securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Gemini's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Gemini securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

94.     During the Class Period, Gemini securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gemini securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Gemini securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Gemini securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

95.     By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

97.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

98.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Gemini, and conducted and participated, directly and indirectly, in the conduct of Gemini's business affairs.  Because of their senior positions, they knew the adverse non-public information about Gemini's misstatement of income and expenses and false financial statements.

99.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Gemini's financial condition and results of operations, and to correct promptly any public statements issued by Gemini which had become materially false or misleading.

100.    Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Gemini disseminated in the marketplace during the Class Period concerning Gemini's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Gemini to engage in the

wrongful acts complained of herein.  The Exchange Act Individual Defendants, therefore, were "controlling persons" of Gemini within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Gemini securities.

101.    Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Gemini.  By reason of their senior management positions and/or being directors of Gemini, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Gemini to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Gemini and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

102.    By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Gemini.

## COUNT III

**(Violations of Section 11 of the Securities Act Against the Individual Defendants)**

103.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

104.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

105.    The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

106.    Gemini is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

107.    As issuer of the shares, Gemini is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

108.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

109.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

110.    Plaintiff acquired Gemini shares pursuant and/or traceable to the Offering Documents for the IPO.

111.    Plaintiff and the Class have sustained damages.  The value of Gemini common stock has declined substantially subsequent to and because of Defendants' violations.

## COUNT IV

**(Violations of Section 15 of the Securities Act Against the Individual Defendants)**

112.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.    This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

114.    The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Gemini within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Gemini to engage in the acts described herein.

28

115.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

116.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 18, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

29