**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: GEMINI SPACE STATION, INC. SECURITIES LITIGATION | **Case No. 1:26-cv-02261**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


NATURE OF THE ACTION ..... 1

JURISDICTION AND VENUE ..... 8

PARTIES ..... 9

I. Plaintiffs ..... 9

II. Defendants ..... 10

FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ..... 12

I. The Winklevoss Defendants Buy Significant Political Influence to Pave the Road for Gemini's IPO ..... 12

II. Gemini Touts its International Operations as a Cornerstone of its Pre-IPO Business ..... 16

III. The Registration Statement Misleadingly Obscured Gemini's Take Rates, Making the Business Seem More Successful ..... 25

IV. The Registration Statement Also Misrepresented Other Key Metrics of Gemini's Business ..... 27

EXCHANGE ACT CLAIMS ..... 28

I. Factual Allegations Applicable Only to Exchange Act Claims ..... 28

II. Exchange Act Materially False or Misleading Statements or Omissions ..... 32

A. September 11, 2025: Registration Statement/Prospectus ..... 32

B. September 29, 2025: Blog Post Regarding International Business ..... 40

C. October 8, 2025: Australia Expansion Announcement ..... 40

D. November 10, 2025: 3Q25 Shareholder Letter ..... 41

E. November 10, 2025: The 3Q25 Earnings Call ..... 43

F. November 12, 2025: Cameron Winklevoss Tweet ..... 47

G. November 13-14, 2025: Bitcoin Amsterdam Conference ..... 48

III. Corrective Disclosures Alleged with Respect to Exchange Act Claims ..... 50

IV. The Winklevoss Defendants Engage in a Fraudulent Scheme to Recoup Funds from their Flailing Business ..... 53

V. Additional Scienter Allegations Applicable to Exchange Act Claims ..... 55

SECURITIES ACT CLAIMS ..... 59

I. Factual Allegations Specific To the Securities Act Claims ..... 59

II. Securities Act Materially False or Misleading Statements or Omissions ..... 60

III. The Registration Statement Omitted Information Required Pursuant to Items 105 and 303 ..... 67

PLAINTIFFS' CLASS ACTION ALLEGATIONS ..... 70

THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....................................... 74
CONTROL PERSON ALLEGATIONS ........................................................................... 75
CLAIMS FOR RELIEF ........................................................................................................ 77
PRAYER FOR RELIEF ........................................................................................................ 88
DEMAND FOR TRIAL BY JURY ......................................................................................... 89

Court-appointed Co-Lead Plaintiffs Shenghe Zhao and Yang Qin, and additional Plaintiff Marc A. Methvin (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("US") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Gemini Space Station, Inc. ("Gemini" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees of the Company or the Confidential Witnesses ("CWs"), and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION[1]

1. This is a federal securities class action on behalf of two classes:

(a) Exchange Act Class: A class consisting of all persons or entities that purchased or otherwise acquired Gemini Class A common stock between September 12, 2025 and February 17, 2026, both dates inclusive (the "Exchange Act Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder; and

[1] Unless otherwise noted, all emphasis is supplied.

(b) Securities Act Class: A class consisting of all persons and entities that purchased Gemini Class A common stock pursuant to or traceable to the Registration Statement upon which the Company went public on September 12, 2025, consisting of the Form S-1 initially filed with the SEC on August 15, 2025, and amendments filed on Form S-1/A dated August 21, 2025, September 2, 2025, September 9, 2025, and September 10, 2025 (collectively, the "Registration Statement"), or of the Form S-8 that extended the Registration Statement to certain employee incentive shares. The Securities Act Class asserts violations under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). These claims are based on Defendants' strict liability and/or negligence, and do not assert that Defendants acted fraudulently.

Excluded from both classes are all Defendants herein, current and former directors, officers, and managers of Gemini (or any subsidiary, predecessor or successor thereof), the immediate family members of any excluded person, and any entity in which any excluded person owns or controls at least a 10% position.

2. Gemini was founded in 2014 by Cameron and Tyler Winklevoss to develop and operate a cryptocurrency ("crypto") platform. For the first several years, Gemini served as an exchange on which US and international purchasers could purchase Bitcoin and later Ethereum and other coins. The business did not involve prediction markets, which are platforms enabling users to buy and sell "event contracts" to gamble on the likelihood of future events.

3. From its early operations through its IPO, Gemini defined itself as a global crypto business and focused on providing services to cryptocurrency investors and traders, including a custodial platform, exchange, staking services, and crypto-linked credit cards.

4. The Registration Statement Defendants used to sell Gemini to public investors was declared effective on September 11, 2025. On or about that date, a Prospectus which formed a part of the Registration Statement was disseminated to investors interested in participating in the IPO. Also on September 11, 2025, Gemini filed a Form S-8 extending the Registration Statement and the Prospectus incorporated therein to employee shares.

5. On September 12, 2025, pursuant to the Registration Statement, Gemini's Class A common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "GEMI." On September 15, 2025, Gemini separately filed the disseminated Prospectus on Form 424B4.

6. Pursuant to the Registration Statement, Gemini and other selling stockholders sold 15,937,501 shares of the Company's Class A common stock to the public at the Offering price of $28.00 per share for proceeds, before expenses, of approximately $437.2 million to the Company.

7. The Registration Statement was negligently prepared and, as a result, contained several untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading under the circumstances in which they were made. The Registration Statement also omitted material information required to be provided under law. Specifically, the Registration Statement: (i) omitted devastating problems in Gemini's international business, including its overwhelming reliance on "top-up" payments and interest-free loans from Gemini's US subsidiaries and lack of infrastructure to even execute trades on its international platforms; (ii) overstated the viability of Gemini's "core" crypto exchange offering

by omitting that the supposed correlation between trading volume and revenue was fundamentally broken, as Gemini's trading revenues were actually *declining* as trading volume *increased*, due in part to fee compression and low-margin institutional trading volume greatly overtaking retail trading volume; (iii) overstated Gemini's "Monthly Transacting Users" ("MTUs") and misrepresented that MTUs were directly correlated with revenue because, according to Defendants' own definition of the metric, users did not have to actually *transact* or generate *any revenue* in order to be counted as MTUs; (iv) omitted Gemini's reliance on heavy political donations to co-opt regulators, a strategy it employed in the United States but neglected internationally; (v) misrepresented Gemini's relationship with the non-Winklevoss members of its executive team, calling them key personnel while omitting that the Winklevoss Defendants (as defined below) were considering terminating all other members of the executive team; (vi) omitted information required to be disclosed under Regulation S-K regarding adverse trends and risks in Gemini's global crypto business, its stated growth strategy, and Gemini's executive team; and (vii) as a result, negligently presented a materially false and misleading description of Gemini's financial prospects and plans.

8. International expansion was the centerpiece of the story Gemini sold to IPO investors. The Registration Statement opened with a letter from Tyler and Cameron Winklevoss declaring that Gemini's mission was to serve customers "anywhere in the world" and described "International Expansion" as a "Key Factor Affecting Our Performance." The Registration Statement also stated Gemini's "future growth depends in part on" that international expansion, identified it as a pillar of the Company's strategy for growing its key metric, and touted a portfolio of foreign licenses spanning the United Kingdom ("UK"), the European Union ("EU"), Singapore, and Australia. Analysts took notice too. On October 7, 2025, analysts at Evercore ISI wrote,

"Secular industry growth, increasing market share, and international expansion together created a multi-pronged growth engine for Gemini. As the company leans into brand-building and marketing, these factors should reinforce each other and drive sustained revenue momentum in the years ahead." But while the Registration Statement and subsequent communications with investors identified Gemini's international operations as strategic and growing, they never told investors about at least two glaring deficiencies.

9. First, the statements omitted that Gemini relied on huge cash transfers to prop up its international businesses. Filings made abroad that were never released to American investors, were not mentioned in the Registration Statement, and were excluded from Gemini's investor relations page, confirm these transfers. *See* ¶¶63-82, *infra*. Gemini's flagship UK exchange entity had no employees and, after more than five years of operation, generated barely £2 million in annual customer fees, with 81% of its reported revenue consisting of contractual "top-up" payments from Gemini's US entities. Its EU exchange entity collected just €717,175 in customer fees for all of 2024, less than the salary of a single member of Gemini's executive team, with roughly 90% of its recorded turnover consisting of intragroup subsidies. The Singapore entity received approximately SGD $10 million in subsidies in 2024, double the prior year. The Australian entity has never filed any financial disclosures to evidence that it ever conducted any meaningful business before closing down. And just ten days after the IPO, Gemini quietly injected £4 million of fresh capital into its UK payments entity, an amount exceeding that entity's entire existing share capital. Nor was the reliance merely financial. They served only as regulatory wrappers, with trades simply re-routed for execution to Gemini's US exchange. Gemini's "international operations," in short, were not businesses.

10. Beginning September 12, 2025, and continuing through January 2026, Defendants Gemini, Tyler Winklevoss, and Cameron Winklevoss doubled down on their misrepresentations. Their statements were not just negligent, but reckless or intentional. For example, Gemini touted its "First Permanent UK Office" as a "major step in [its] European expansion," and announced a "major step forward" in Australia. It also assured investors on its 3Q 2025 earnings call that its expanding global footprint "reinforces the strength of our model," projected 20% to 25% compound MTU growth, and proclaimed at Bitcoin Amsterdam that Gemini would "mainstream Bitcoin in Europe"—all while executives making those statements sat on the boards of and/or approved undisclosed subsidy payments to keep those entities afloat.

11. On February 5, 2026, Gemini issued a Current Report on a Form 8-K, announcing that Gemini would suddenly abandon the UK, EU, and Australian markets it had previously described to investors as central to its growth strategy and would lay off up to 200 employees representing approximately 25% of the Company's workforce. Attached to the February 5, 2026, Form 8-K was a Regulation FD disclosure attaching a blog post authored by the Winklevoss Defendants in which they sought to portray the news favorably as a pivot to "Gemini 2.0" and cited, among other things, increasing adoption of "AI" as a rationale for the lay-off as well as the shuttering of international operations.

12. On news of the international retreat, Gemini's Class A common stock price fell $0.64 per share, or 8.72%, to close at $6.70 per share on February 5, 2026.

13. Then, on February 17, 2026, Gemini issued a Current Report on Form 8-K, announcing that it had unceremoniously fired all three non-Winklevoss members of the executive team described in its Registration Statement: Marshall Beard, its former Chief Operating Officer

("COO"), Dan Chen, its former Chief Financial Officer ("CFO"), and Tyler Meade, Gemini's former Chief Legal Officer.

14. On this news, Gemini's stock price fell $0.975 per share, or 12.9%, to close at $6.585 per share on February 17, 2026.

15. On or after February 17, 2026, Tyler and Cameron Winklevoss updated the live version of their blog post referenced in ¶11 above to confirm that the departures of Beard, Chen, and Meade were part of the Gemini 2.0 pivot. Cryptocurrency news outlet CoinDesk likewise tied the simultaneous removal of the three C-suite officers directly to the Company's retreat from international markets. On February 17, 2026, CoinDesk expressly linked the ousters to Gemini's international exit, emphasizing that the departures followed by only days the Company's announcement that it would wind down its exchange operations in the UK, the European Union, and Australia. The article correctly characterized Gemini's global retreat as sweeping. Thus, in a span of only five months since the IPO, and without any warning, Gemini had gone from trumpeting its international operations as levers for growth to basically abandoning them altogether. "Gemini 2.0" was now a materially different business than the one described to investors in the IPO.

16. Analysts were stunned by the news of the executive departures. For example, analysts with Cantor mused, "It is not every day that we see a full replacement of virtually the entire C-suite, and we struggle to see how any of this can be viewed positively…. GEMI is effectively focusing solely on the US, which means international revenue will go to zero, and this was 15% of revenue in the first nine months of 2025." Similarly, analysts with Truist Securities stated, "We also believe that this morning's announcement (worse than expected net loss, CFO is leaving, etc.) could result in more investors becoming concerned about Gemini's solvency."

17. As a result of Defendants' wrongful acts and omissions, Gemini shares declined precipitously, far worse than Bitcoin or the shares of crypto peers:




18. Consequently, Plaintiffs and other Class members suffered significant economic losses and damages.

## JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Gemini's Class A common stock was offered and sold,

and has traded at all relevant times, on the NASDAQ, which is located in this District. Additionally, Gemini's SEC filing lists its principal offices as being within this District, and Gemini has registered with the New York Department of Financial Services to operate a crypto exchange within this District.

22. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### I. Plaintiffs

23. Co-Lead Plaintiff Shenghe Zhao, as set forth in his previously filed Certification, purchased or otherwise acquired Gemini Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO and during the Exchange Act Class Period. *See* ECF No. 34-1.

24. Co-Lead Plaintiff Yang Qin, as set forth in his previously filed Certification, purchased or otherwise acquired Gemini Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO and during the Exchange Act Class Period. *See* ECF No. 42-2.

25. Additional named Plaintiff Marc A. Methvin, as set forth in his previously filed certification, purchased or otherwise acquired Gemini Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO and during the Exchange Act Class Period. *See* ECF No. 1-1.

## II. Defendants

26. Defendant Gemini is a Nevada corporation with principal executive offices located at 600 Third Avenue, 2nd Floor, New York, NY, 10016. The Company's Class A common stock trades in an efficient market on the NASDAQ under the ticker symbol "GEMI."

27. Defendant Tyler Winklevoss, Gemini's Co-Founder, served as the Company's Chief Executive Officer ("CEO") and one of its Directors at all relevant times. Tyler Winklevoss signed the Registration Statement.

28. Defendant Cameron Winklevoss, Gemini's Co-Founder, served as the Company's President and one of its Directors at all relevant times. Cameron Winklevoss signed the Registration Statement via his attorney-in-fact Dan Chen.

29. Defendant Sachin Jaitly ("Jaitly") served as a Director of Gemini at all relevant times, and signed the Registration Statement via his attorney-in-fact Dan Chen.

30. Defendant Jonathan Durham ("Durham") served as a Director of Gemini at all relevant times, and signed the Registration Statement via his attorney-in-fact Dan Chen.

31. Defendant James Esposito ("Esposito") served as a Director of Gemini at all relevant times, and signed the Registration Statement via his attorney-in-fact Dan Chen.

32. Defendant Maria Filipakis ("Filipakis") served as a Director of Gemini at all relevant times, and signed the Registration Statement via her attorney-in-fact Dan Chen.

33. Defendants Tyler Winklevoss, Cameron Winklevoss, Jaitly, Durham, Esposito, and Filipakis are collectively referred to herein as the "Director Defendants." Each of them signed or authorized the signing of the Registration Statement filed with the SEC. Each had the ability to control the contents of the Registration Statement, to ensure that the statements made in the Registration Statement were true, that no information was omitted that was necessary to make the

statements made therein not misleading, and that the Registration Statement provided all required information.

34. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter of Gemini's IPO, and was identified as an underwriter in the Registration Statement.

35. Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets") served as an underwriter of Gemini's IPO, and was identified as an underwriter in the Registration Statement.

36. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter of Gemini's IPO, and was identified as an underwriter in the Registration Statement.

37. Defendant Cantor Fitzgerald & Co. ("Cantor Fitzgerald") served as an underwriter of Gemini's IPO, and was identified as an underwriter in the Registration Statement.

38. Defendants Goldman Sachs, Citigroup Global Markets, Morgan Stanley, and Cantor Fitzgerald, are collectively referred to herein as the "Underwriter Defendants." Through their role as underwriters, these Defendants had the opportunity to conduct due diligence and were able, if they exercised due care, to ascertain whether the statements made in the Registration Statement were true, whether the Registration Statement omitted information necessary to make the statements made therein not misleading, and whether the Registration Statement provided all required information.

39. Defendants Tyler Winklevoss and Cameron Winklevoss (together, the "Winklevoss Defendants") each controlled and possessed the power and authority to control the contents of Gemini's SEC filings, press releases, and other market communications during the Exchange Act Class Period. Each was provided with copies of Gemini's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity

to prevent their issuance or to cause them to be corrected. Because of their day-to-day responsibilities and positions with Gemini, and their access to material information available to them but not to the public, both Winklevoss Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. Both are liable for the false or misleading statements and omissions pleaded herein during the Exchange Act Class Period as well as the alleged fraudulent scheme.

40. Gemini and Tyler and Cameron Winklevoss are collectively referred to herein as the "Exchange Act Defendants."

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### I. The Winklevoss Defendants Buy Significant Political Influence to Pave the Road for Gemini's IPO

41. Tyler and Cameron Winklevoss became two of the first Bitcoin billionaires by using $11 million of a $65 million settlement they received from a lawsuit against Facebook to buy Bitcoin when it was priced under $150. They used some of the other funds to start Gemini, a crypto exchange they co-founded in 2014. At the time, the dominant crypto exchange, Mt. Gox, imploded, leaving many crypto users seeking a more stable alternative. Along with a few other competitors, Gemini filled that role. It initially offered Bitcoin trading and custody, then expanded into other coins like Ethereum. During the time period relevant to this Complaint, Gemini allowed approximately 100 coins to trade on its exchange.

42. The Winklevoss Defendants, who were not donors to President Trump during his first administration,[2] found their business in the sights of federal regulators in 2017. At that time, Gemini was preparing a self-certification as part of its efforts to get licensed by the Commodity

---

[2] The Federal Election Commission database lists no donations from either Tyler or Cameron Winklevoss to President Trump's campaign or any Trump PAC between 2015 and 2020.

Futures Trading Commission ("CFTC") as a Designated Contract Market ("DCM"), so it could offer Bitcoin futures. But when evaluating the self-certification, the CFTC began investigating false and misleading statements that Gemini made, or caused to be made, to CFTC staff, including misrepresentations of leverage, omissions of undisclosed loans and advances, and secret fee rebates and overrides.

43. Gemini fared no better with the SEC during President Trump's first administration. On March 10, 2017, and again on July 26, 2018, the SEC rejected Gemini's attempts to establish an exchange-traded fund linked to the price of Bitcoin.

44. In 2020, despite the ongoing CFTC investigation, Gemini formally applied with the CFTC for DCM status. That application was not advanced.

45. In 2022, the CFTC sued Gemini for its 2017 false and misleading statements (the "CFTC Enforcement Case"). A copy of the CFTC complaint is available at https://www.cftc.gov/media/7316/enfgeminicomplaint060222/download. Blaming "indefinite regulatory paralysis, mounting litigation costs, and the stigma of the pending Complaint," Gemini agreed to settle those claims in late December 2024 for $5 million. *See Commodity Futures Trading Commission v. Gemini Trust Co., LLC*, No. 1:22-cv-04563-AKH (S.D.N.Y. May 27, 2026), ECF No. 216 at 13.

46. Gemini also found itself in the crosshairs of federal and state regulators after its customers lost digital assets staked in a program called Gemini Earn after the collapse of Gemini partner Genesis Global Capital. In January 2023, the New York Attorney General sued Gemini, Genesis, and a parent of Genesis for defrauding customers in this program. The SEC also brought suit, alleging that the Gemini Earn program was an illegal unregistered securities offering. To avoid a likely fatal penalty from its principal state regulator, the New York Department of

Financial Services, Gemini agreed in February 2024 to restore digital assets to Gemini Earn customers and to pay a $37 million fine for "significant failures that threatened the safety and soundness of the company." *See* https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202402282. A month later, in March 2024, it settled SEC charges by agreeing to an additional $21 million penalty and a permanent injunction against further sales of unregistered securities. In June 2024, after the digital assets were restored to Gemini Earn customers, Gemini settled the New York state charges against it for $50 million.

47. Gemini understood from these experiences that it needed to invest heavily in political donations to avoid further regulatory scrutiny. The Winklevoss Defendants each donated $1 million in Bitcoin to President Trump's re-election campaign in 2024. Months later, they donated approximately $3.5 million in Bitcoin to the MAGA Inc. Super PAC, as well as other Trump-linked PACs. Both also invested in American Bitcoin Corp., the crypto mining venture co-founded by Eric Trump and Donald Trump, Jr. And they made a $21 million donation to a crypto PAC that pledged to support Trump. They also contributed to other Trump-supporting crypto PACs, were contributors to the fund to build the White House ballroom, and invested in a private club partly owned by Donald Trump, Jr.

48. Cameron Winklevoss said that Gemini would not have been able to go public but for getting President Trump elected, and that their tactics might have landed them in jail with another administration: "[W]e were able to take Gemini public in September. That never would have been possible with Gary Gensler and the previous SEC regime…we had the first ever crypto summit at the US [ ] White House, and we all remarked we said a year ago we were more likely to end up in the jail house than the White House." *See* https://youtu.be/P3y1ak369IU?t=242.

49. Gemini also used its political clout to influence the Trump Administration to switch its nominee for CFTC chair. In February 2025, after President Trump announced the nomination of Brian Quintenz to lead the CFTC, both of the Winklevoss Defendants initially praised Quintenz. Cameron Winklevoss said that Quintenz was "exactly the leader the CFTC needs," and Tyler Winklevoss called him a "[g]reat choice."

50. But in July 2025, the Winklevoss Defendants exchanged personal texts with Quintenz. Quintenz understood that the Winklevoss Defendants were pressuring him to promise to overturn the 2022 CFTC $5 million settlement. "I believe these texts make it clear what they were after from me, and what I refused to promise," Quintenz said in social media posts. *See* https://www.coindesk.com/policy/2025/09/10/trump-s-cftc-hopeful-quintenz-takes-his-dispute-with-tyler-winklevoss-very-public. Quintenz said he refused to make that promise if confirmed, and President Trump soon thereafter withdrew Quintenz's nomination. "It's my understanding that after this exchange they contacted the president and asked that my confirmation be paused for reasons other than what is reflected in these texts," Quintenz explained. *Id.*

51. In August 2025, in a bid to exert even more personal political influence, the Winklevoss Defendants founded and contributed more than $21 million to the Trump-aligned Digital Freedom Fund PAC.

52. Reporters chronicled how the Winklevoss Defendants "reached out to Trump directly with concerns about Quintenz" and how they told President Trump that "he should dump Quintenz." *See* https://www.politico.com/news/2025/07/30/winklevoss-brothers-trump-wall-street-regulator-quintenz-00485801. On September 30, 2025, President Trump formally withdrew Quintenz's nomination for CFTC Chairman and thereafter nominated Michael Selig, who was shortly thereafter confirmed by the US Senate on December 18, 2025.

53. The Winklevoss Defendants' new political influence also greased the wheels for Gemini's long-sought DCM registration and provided them with a seat of influence at the CFTC. On December 10, 2025, Gemini announced that the CFTC finally granted its DCM application, and the CFTC announced that the Winklevoss Defendants were selected for the CFTC's CEO Innovation Council.

54. Then, on May 27, 2026, the CFTC joined Gemini in a motion to vacate the prospective provisions of the consent order entered in the CFTC Enforcement Case. But nothing about Gemini's misleading 2017 statements to the agency had changed between the filing of the CFTC Enforcement Case and May 27, 2026. The only change was the CFTC's leadership – one that was influenced by the Winklevoss Defendants.

## II. <u>Gemini Touts its International Operations as a Cornerstone of its Pre-IPO Business</u>

55. Gemini repeatedly touted its international business leading up to the IPO. On December 30, 2024, nine months before the IPO, Gemini published a blog post hyping "Gemini's Commitment to the EU Market," which stated:

> Our commitment to regulatory compliance is steadfast, and we see adhering to the EU's Travel Rule as a critical step forward in fostering a secure environment for cryptocurrency transactions.
>
> Gemini is committed to working collaboratively with regulators around the world to help the crypto industry flourish in a compliant, sustainable, and safe manner.

56. In a follow-up post on January 27, 2025, Gemini called the EU "a key market for Gemini," and stated that compliance with the Markets in Crypto-Assets Regulation ("MiCA") would allow Gemini to expand its offerings "across all EU jurisdictions, whilst [Gemini] work[ed] to broaden their [presence]."

57. Three weeks before the IPO, on August 19, 2025, Gemini published another blog post celebrating that its "customers in the European Union can now access a range of tokenized

ETFs on Gemini" and that Gemini's expanded offerings in the EU meant that "EU-based Gemini users can now trade tokenized stocks and ETFs, 24/5."

58. The next day, Gemini published another blog post titled "Gemini Receives Its MiCA License, ***Supporting Ongoing EU Expansion***" and specifically highlighted that receiving the MiCA License marked "***a critical milestone in our regulated European expansion, as it will allow us to offer secure and reliable crypto across all 30 European countries and jurisdictions, unlocking a vastly larger market***."

59. Tyler Winklevoss took to X.com (formerly Twitter) to announce to his one million followers Gemini's expanded offerings to the UK, including the ability to stake SOL and ETH, and reaffirming the Company's stated goal of continuing international expansion:



60. And then, days before the IPO, on September 5, 2025, another Company blog post framed Europe as a "strategic focus" and stated that the Company intended to "deepen" the EU market and described it as "growing":

> This continues our European expansion as we become the go-to crypto trading destination for European investors after receiving … (MiCA) approval from the MFSA.
>
> * * *
>
> **Deepening our Commitment to Europe**
>
> Today's announcement is just the beginning, as we continue to innovate and roll out new products to meet the growing demand for crypto throughout Europe.
>
> * * *
>
> Europe continues to be a strategic focus for Gemini … Gemini has long championed clear, forward-thinking regulation, and MiCA will allow us to continue to deepen our presence in the region.

61. That same day, Tyler Winklevoss announced EU staking and perpetual futures offerings to his social media followers:




62. Although Gemini repeatedly touted its international operations to investors, it made none of the operational and political investments internationally that it did in the US. Instead, its international businesses acted as cutouts, or as they described to auditors, "limited risk distributors," for Gemini's US operations. Worse, they relied upon massive "top-up" payments from the US operations that were disclosed to foreign regulators but not to US investors, without which they could not survive. These top-up payments were growing at the time of the IPO and crippled Gemini's performance.

63. Unlike the US, the UK, Ireland, and Singapore require private subsidiaries to file audited annual accounts with regulators. In the UK, those companies file with Companies House; in Ireland, with the Companies Registration Office; and in Singapore, with the Accounting and

Corporate Regulatory Authority. Although not easy to locate or readily accessible, the reports are publicly available.

64. According to UK filings, Gemini gathered UK customers and funds through two wholly owned subsidiaries, each an indirect subsidiary of Gemini Space Station, Inc. and each governed by the same three-member board: Daniel Slutzkin, Gemini Chief Operating Officer Marshall Beard, and Mark Jennings.

65. Gemini Intergalactic UK, Ltd. ("Gemini UK") was the customer-facing exchange entity: an FCA-registered crypto asset firm whose principal activity was providing digital asset exchange and custody services to UK consumers and institutions as a "limited risk distributor" of the exchange platform operated by its US affiliates, Gemini Trust Company, LLC and Gemini Liquidity, LLC (the "US Affiliates").

66. Because Gemini UK had registered as a limited risk distributor, it did not bear the risk of maintaining its own operating margins like traditional companies. Instead, the US Affiliates paid it a contractually guaranteed small profit, regardless of actual margins. Those contractual "top-up" payments were counted as revenue.

67. Gemini Payments UK, Ltd. ("Gemini Payments") was an FCA-authorized electronic money institution that provided the e-money accounts and payment processing through which UK customers funded their Gemini trading, and which employed the UK operation's staff.

68. Gemini UK and Gemini Payments processed UK customers' orders as follows:




69. Thus, the UK entities served as a legal and regulatory wrapper around an American service. One held the money-handling license; the other held the crypto-firm registration. Neither actually facilitated cryptocurrency transactions.

70. Gemini UK, the exchange license holder, had no employees. Its audited accounts state that "[t]he Company employed no staff during the current year or prior year (including executive directors)," with staff costs of "£nil." Gemini Payments employed an average of twenty-seven employees in 2024, with four in sales and marketing, twelve in general and administration, and eleven in technology.

71. For the full year 2024, Gemini UK, the entirety of Gemini's customer-facing UK exchange and custody business, generated £2,038,681 in customer trading and custody fees. In 2023, it generated only £1,402,433. That was the UK operation's real, third-party revenue base after more than five years of regulated operation in what the Registration Statement portrayed as a key international "growth" market.

72. Those meager customer fees could not cover the operation's costs. Under intragroup agreements disclosed in UK filings but not in the Registration Statement, Gemini UK received

from the US Affiliates a "service fee based on an agreed upon target operating margin," or in the words of its own audited accounts, "[i]f exchange fees earned are insufficient to reach the target operating margin, additional revenue is received from both Gemini Trust Company LLC and Gemini Liquidity, LLC, to meet the target operating margin. Exchange fees earned for the year ended 31 December 2024 were insufficient to reach the target operating margin. Additional fees earned under this arrangement for the year ended 31 December 2024 totaled £9,342,299 (2023: £7,001,691)."

73. This intragroup subsidy, disclosed to UK regulators but not US investors, was the only thing keeping the UK entities afloat. The £9.3 million top-up from the US Affiliates constituted 81% of Gemini UK's reported £11.5 million turnover (the European term for revenue) and was more than four and a half times the entity's actual customer revenue. After receiving the top-up payments, Gemini UK reported a profit before tax of just £61,161, and a profit for the year of £38,406, on net assets of £433,708. Without the contractual top-up, the UK exchange business operated at a multi-million-pound annual loss.




Source: Gemini Intergalactic UK, Ltd Annual Report and Financial Statements (FY 2024), Notes 3 & 16 (filed at Companies House Sept. 30, 2025).

74. Gemini UK said as much to UK regulators: "Whilst the Company remains profitable, it is ultimately reliant on the Gemini Group for operational support and as a source of revenue and, therefore, cash flow. [Gemini UK's] profitability is ensured by the intra-group agreements … which somewhat insulate it from the decline in the markets." Gemini Payments was even worse: it had no third-party revenue whatsoever and relied on fees from Gemini UK, funded predominantly from subsidies from the US Affiliates.

75. On September 22, 2025, ten days after Gemini completed its IPO, the directors of Gemini Payments approved a capital injection of £4,000,000 to be provided by its US parent Gemini Intergalactic, LLC. The £4 million injection was nearly three times Gemini Payments' entire existing share capital and capital contributions combined (£1,400,001), as well as its year-end operating cash (£1,370,812).

76. In 2023, Gemini Payments received £800,304 in interest-free short-term funding from affiliate Gemini Trust Company, LLC to cover its operating costs in a year in which the entity posted an operating loss of £557,510.

77. Gemini's EU business, which filed reports in Ireland, was structured in a similar fashion. Gemini Intergalactic Europe, Limited ("GIEL") was Gemini's EU exchange entity and was registered as a Virtual Asset Service Provider with the Central Bank of Ireland and in France, Spain, Italy, and Greece. Gemini Payments Europe Limited ("GPEL") was the electronic money institution that provided the e-money accounts and payment processing through which EU customers funded their Gemini trading.

78. GIEL and GPEL were parties to intragroup agreements whereby the US Affiliates provided additional revenue subsidies so that GIEL and GPEL reached a "target operating margin."

| GIEL turnover (€) | FY2023 | FY2024 |
|---|---|---|
| Exchange fees earned (customers) | 706,706 | 717,175 |
| Intragroup "distributor services" top-up | 6,276,826 | 6,349,661 |
| Total turnover | 6,983,532 | 7,066,836 |
| Intragroup share | 89.9% | 89.9% |

79. The EU business was even more dependent than the UK entities on subsidies from Gemini's US business. Almost ninety percent of the European exchange's "revenue" consisted of subsidies paid to it by US Affiliates. Customer fees for the entire EU operation were only €717,175 for the year, less than the base salary of any member of Gemini's executive team.

80. GIEL also received millions of euros in interest-free loans from Gemini Trust.

81. Even Gemini's Singapore-based exchange, which operated through Gemini Digital Payments Singapore, Pte. Ltd. ("GDPS"), was propped up by subsidies that were not disclosed to US investors. It too was party to an intragroup agreement with the US Affiliates that provided GDPS with funds to meet its "agreed upon target operating margin." In the year ending December 31, 2024, GDPS received approximately SGD $10 million in revenue from this intragroup subsidy, more than twice what it received in 2023.

82. In Australia, Gemini Intergalactic Australia, PTY Ltd. ("GIAP") was "registered with the Australian Transaction Reports and Analysis Centre ("AUSTRAC") to provide digital currency exchange services in Australia" and, according to the Registration Statement, was slated to launch in the fourth quarter of 2025. However, a search of the Australian Securities and Investments Commission shows that GIAP has never filed any financial statements or reports evidencing that GIAP actually conducted any business, further reflecting that the international expansion plans touted in the Registration Statement were illusory.

83. CW1 served as a senior executive in Gemini's product design team from January 2025 through March 2026. CW1 initially reported to Gemini's Head of Growth and, starting in April 2025, reported directly to Cameron Winklevoss. CW1 helped prepare decks and presentation materials used in the lead-up to the IPO, personally worked on the design of Gemini's prediction market product, and supervised the outside consultant and the designer assigned to it.

84. CW1 participated in calls involving Gemini's European employees and in product work required to comply with local regulatory requirements. According to CW1, it was understood among the employees working on the international projects, even before the IPO, that those markets were not performing. CW1 was told by European colleagues that the European audience was small, and there was not much focus on those markets by the Company because the economics were poor. CW1 described Gemini's approach as spend before seeing market fit. CW1 recalled that these concerns existed before the IPO.

85. Reports to European regulators corroborated CW1's statements, confirming that nearly all "revenue" consisted of subsidy "top-up" payments from Gemini's US Affiliates.

## III. The Registration Statement Misleadingly Obscured Gemini's Take Rates, Making the Business Seem More Successful

86. Prior to its IPO, Gemini was losing money at a rapid pace. As revealed in the Registration Statement, for the six months ended June 30, 2025, Gemini posted a net loss of ***$(282.5) million*** on revenue of $68.6 million, versus a net loss of $(41.37) million on revenue of $74.3 million a year earlier. Gemini's year-over-year net loss had increased by approximately ***583%***. What makes this performance even more remarkable, however, is that its revenue actually *declined* even while year-over-year trading volume increased by nearly *50%*.

87. Historically, Gemini has primarily generated revenue by monetizing its crypto platform through transaction, deposit, and other fees charged to its users. Gemini monetized its

platform almost entirely through fees, with 90.9% of fiscal 2024 revenue and 92.0% of first-half 2025 revenue coming from customer fees. Trading fees dominated that base, with exchange revenue supplying 74.2% and 69.3% of fee revenue, respectively, roughly 93–95% of which came from retail investors. Gemini monetized its crypto platform through fees, and overwhelmingly through trading fees: exchange revenue was 67.4% of total revenue in fiscal 2024 and 63.8% in the first half of 2025, and approximately 93–95% of exchange revenue came from retail investors. Because Gemini charged trading fees as a percentage of the value of cryptocurrency traded, two distinct measures, each expressed in basis points, capture the unit economics of the business: (i) the average fee rates charged to each customer segment; and (ii) the blended "take rate," *i.e.*, the total exchange revenue earned per dollar of total trading volume, which depends on both the segment fee rates and the mix of retail and institutional volume. The Registration Statement said that retail customers paid average monthly exchange fees of 100 to 140 basis points in 2024 and 100 to 130 basis points in the first half of 2025, depending on channel mix, while institutional customers paid on average just 3 to 5 basis points in 2024 and 2 to 3 basis points in the first half of 2025. This means institutional customers were charged, on average, one-thirtieth and one-forty-fifth the retail rate in 2024 and the first half of 2025, respectively. Gemini's institutional economics were even thinner than these rates suggest. The Registration Statement said that a relatively small number of institutional market makers historically accounted for around half of total trading volume on the platform, and that Gemini provided those market makers incentive credits that reduced its net trading fees, with the credits growing by $1.5 million in the first half of 2025 alone, as compared to the first half of 2024. Gemini thus increasingly paid its largest traders to trade. Given the significantly lower rates institutional customers were charged, massive

increases in low-margin institutional trading volume produced minimal revenue and drove the blended take rate sharply lower, thus breaking the supposed volume-revenue link.

88. Although the Registration Statement disclosed the fee ranges charged to each customer segment, it failed to disclose Gemini's blended take rate. The figures in the Registration Statement nonetheless confirm that the blended take rate declined considerably in 2024 and the first half of 2025:

| | FY2023 | FY2024 | 6M 2024 | 6M 2025 |
|---|---|---|---|---|
| Retail Trading Volume ($B) | $3.6 | $7.0 | $3.2 | $3.3 |
| Institutional Trading Volume ($B) | $8.9 | $31.6 | $13.4 | $21.5 |
| Total Trading Volume ($B) | $12.5 | $38.6 | $16.6 | $24.8 |
| Exchange Revenue ($M) | $56.4 | $95.8 | $50.8 | $43.8 |
| Blended take rate | 45.1 bps | 24.8 bps | 30.6 bps | 17.7 bps |

Take-rate arithmetic: FY2023: $56.4M ÷ $12,500M = 45.1 bps; FY2024: $95.8M ÷ $38,600M = 24.8 bps; 6M 2024: $50.8M ÷ $16,600M = 30.6 bps; 6M 2025: $43.8M ÷ $24,800M = 17.7 bps.

## IV. <u>The Registration Statement Also Misrepresented Other Key Metrics of Gemini's Business</u>

89. Facing fee compression and historic losses on increased trading volume, Gemini touted several other "key performance indicators" (or "KPIs") to investors in its Registration Statement. One such KPI was MTUs, which Gemini stated was a "core indicator of platform engagement and overall business health…that serve[s] as a top-of-funnel metric in [its] internal financial forecasting processes." Gemini defined an MTU very broadly to include not only "any retail or institutional user who has engaged in any revenue-generating activity" in the prior month, but also users *who do not actually transact* on its platform but instead merely "hold[] a balance" on its exchange *or credit card*, "complete[] a fiat (wire) or digital asset withdrawal from [Gemini's] platform," or "engage in transactions that are non-revenue generating, such as…sending and receiving crypto assets between wallets." Defendants utilized this unusual definition to their

benefit, and numerous analysts who initiated coverage of Gemini following its IPO specifically cited MTUs when evaluating the Company's business and growth.

90. Gemini's definition of MTUs differs meaningfully from the definition employed by Coinbase Global, Inc. ("Coinbase"), Gemini's competitor and the second-largest cryptocurrency exchange in the world by trading volume. Notably, Coinbase has been publicly listed on the NASDAQ since April 14, 2021. In contrast to Gemini, which counts users as MTUs *who do not actually transact*, Coinbase defines MTUs in its Form 10-K for the fiscal year ended December 31, 2025, to include only "consumer[s] who actively or passively transacts in one or more products on our platform at least once during the rolling 28-day period ending on the date of measurement."

91. Gemini tracked MTUs closely. CW2, who served in a role of business development and analysis at the Company from June 2025 to February 2026, and worked directly with Cameron and Tyler Winklevoss, stated that the Company used the Looker platform to analyze financial and MTU data, and that the platform displayed key performance indicators reported at weekly leadership meetings.

## **EXCHANGE ACT CLAIMS**

### I. **Factual Allegations Applicable Only to Exchange Act Claims**

92. In its initial August 15, 2025 Form S-1, the Company described its use of IPO proceeds as follows:

> We intend to use the net proceeds from this offering (including any additional proceeds that we may receive if the underwriters exercise their option to purchase additional shares of our Class A common stock) for general corporate purposes, and ***we may also use the net proceeds to repay all or a portion of our third-party indebtedness, including indebtedness outstanding under the Galaxy Lending Agreement and the Master Repurchase Agreement with NYDIG Funding LLC.***

93. On August 28, 2025, the SEC sent the Company a letter (disclosed to investors only after the IPO) requesting that it disclose the terms of any debt to be repaid with a material part of the IPO proceeds:

> We note your disclosure that you may "use the net proceeds to repay all or a portion of [y]our third-party indebtedness, including indebtedness outstanding under the Galaxy Lending Agreement and the Master Repurchase Agreement with NYDIG Funding LLC." ***To the extent a material part of the proceeds will be used to discharge indebtedness, please disclose the interest rate and maturity of such indebtedness. If the indebtedness to be discharged was incurred within one year, describe the use of the proceeds of such indebtedness other than short-term borrowings used for working capital***.

94. The Company did not do so. Instead, Gemini deleted the debt repayment information from the use of proceeds section and added language giving management broad discretion:

> We intend to use the net proceeds from this offering and the concurrent private placement…for general corporate purposes, ***which may include*** product development, general and administrative matters, capital expenditures, and ***repayment of all or a portion of our third-party indebtedness***.
>
> The expected use of net proceeds represents our intentions based upon our current plans and business conditions…The amounts and timing of our actual expenditures may vary significantly depending on numerous factors. As a result, ***our management will retain broad discretion over the allocation of such net proceeds***.

95. The Registration Statement described several lending agreements between Gemini and Winklevoss Capital Fund, LLC ("WCF") which were entered into during the years ended December 31, 2024 and 2023, through which the Company received crypto assets from WCF, at interest rates between 4% and 8%, to use as collateral for third-party loans. WCF is identified as a "related party" because it is owned by the Winklevoss Defendants. Importantly, the loans have no maturity date and no covenants, and WCF can demand repayment in full or in part at any time on written notice, with Gemini required to repay by the end of that business day.

96. Gemini used the crypto assets received from WCF as collateral to obtain third-party loans from Galaxy Digital, LLC ("Galaxy") and NYDIG Funding LLC, among others. As recounted in the Prospectus, as of June 30, 2025, $116.5 million in principal was outstanding under the Galaxy Lending Agreement at rates of 11-12%. Because the Galaxy Lending Agreement required pledging crypto collateral amounting to 145-155% of the outstanding principal at origination, and Gemini paid WCF 4-8% interest to borrow that crypto collateral so it could be pledged to support the loan, Gemini paid total interest of ***17.1% to 23.1%*** to borrow the $116.5 million in principal. This is a borrowing cost no healthy company would tolerate. For context, on May 29, 2024, and November 1, 2024 (the dates Gemini entered into the loans totaling $116.5 million in principal with Galaxy), the ICE BofA US High Yield Index Effective Yield for below-investment-grade (junk) corporate bonds (FRED: BAMLH0A0HYM2EY) was "only" 7.86% and 7.1%, respectively.

97. Importantly, Gemini did not use the proceeds of these loans to satisfy even higher interest debt obligations, but instead "for general operating activities." In other words, Gemini's business was performing so miserably that the Winklevoss Defendants' personal cryptocurrency wealth (used as collateral for expensive, third-party loans) was the only thing keeping it afloat.

98. On October 8, 2025, just 27 days after the IPO, Gemini initiated repayment of the entire $116.5 million Galaxy loan with IPO proceeds. In so doing, Gemini used approximately ***27%*** of the total gross IPO proceeds just to retire the principal due to a single creditor. Thereafter, on October 9, 2025, Gemini repaid in full the hundreds of millions of dollars' worth of crypto it had borrowed from related-party WCF that had collateralized the Galaxy loan: 898 BTC and 26,629 ETH. Although the balance was repaid just after the IPO, the Galaxy Lending Agreement

remained in effect until December 15, 2025 "solely to satisfy a contractual 90-day notice period" and was "fully settled" as of December 31, 2025.

99. The Winklevoss Defendants undid the WCF lending agreements at the most opportune time. On October 9, 2025, according to Gemini data, the spot price for BTC was $121,702.31, and for ETH was $4,368.65, both close to all-time highs. As a result, the collateral, which was pledged when the crypto assets were worth far less, had exploded in value. Within 24 hours of Galaxy releasing the crypto collateral, $225,621,455.23 of personal collateral was restored to the Winklevoss Defendants, who personally benefited by that same amount as a result of Gemini using IPO proceeds to pay back the Galaxy loan those assets collateralized.

100. Additionally, the Registration Statement revealed that between September 2023 and January 2025, Gemini entered into separate Convertible Term Loans with, and issued Convertible Notes to, WCF. The sole stated purpose of the Convertible Term Loans and the Convertible Notes was to "provide liquidity for general operations." Pursuant to their terms, immediately prior to the closing of the IPO, ***$695.6 million*** drawn under the Convertible Term Loans and Convertible Notes would automatically convert into Class B common stock at a discount rate of 20% to the IPO price. Thus, upon closing of the IPO at $28/share, those amounts automatically converted to 31,055,951 shares of Class B common stock, valued at $22.40 per share ($28 * 0.80 = $22.40). The related-party discount provided WCF (and the Winklevoss Defendants) a unique personal benefit to the tune of an additional ***$173,966,628*** in present value upon closing of the IPO.

101. On September 12, 2025, pursuant to the Registration Statement, Gemini and selling stockholders sold 15,937,501 shares of the Company's Class A common stock to the public for $28.00 per share, raising, before expenses, approximately $437.2 million for the Company. The timing could not have been better. While Gemini set the initial price range for its IPO at $17-$19

per share, the range was revised to $24-$26 after the roadshow and was ultimately priced at $28/share, even above the top end of the raised range, on an oversubscribed, reduced share count of 15,178,572 (down from 16,666,667). *See* https://finance.yahoo.com/news/crypto-exchange-gemini-raises-425m-040429554.html. These shares began publicly trading on the NASDAQ under the ticker symbol "GEMI."

102. On September 15, 2025, Gemini filed the already-disseminated IPO Prospectus with the SEC on Form 424B4. The Prospectus had previously been filed as the body of the Registration Statement.

## II. Exchange Act Materially False or Misleading Statements or Omissions

### A. September 11, 2025: Registration Statement/Prospectus

103. The Exchange Act Class Period begins on September 12, 2025, when Gemini Class A common stock began trading on NASDAQ.

104. Gemini's Registration Statement makes clear that the Company's mission is to "connect [customers] into the frontier of crypto and grow this frontier into the mainland…. And our mission is to do this for anyone, ***anywhere in the world***." It described Gemini's cryptocurrency exchange as its "core...product," and explained that the Company was founded to be a ***global*** cryptocurrency exchange, stating *inter alia*:

> Gemini was founded in 2014 to be the most trusted, secure, and easy way to buy, sell, and store crypto assets. As of July 31, 2025, we serve approximately 549,000 MTUs and approximately 10,000 institutions ***in over 60 countries***, with over $21 billion of assets on our platform, over $285 billion in lifetime trading volume, and over $830 billion in transfers processed on our platform.

105. The statements identified in Paragraph 104 above were materially misleading when made because they omitted: (a) that Gemini's international businesses were reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans, without which they could not survive; (b) the growing undisclosed subsidies were crippling Gemini; and

(c) Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

106. The Registration Statement described "International Expansion" as a "Key Factor Affecting Our Performance." Specifically, it stated:

> *International Expansion*
>
> Our future growth depends in part on our ability to expand into new markets and jurisdictions. Expansion of our product offerings and user base into new geographies will require increased costs related to marketing, legal expenses and localization of product features.

107. The statements identified in Paragraph 106 above were materially misleading when made because they omitted: (a) that Gemini's international businesses were reliant on undisclosed intragroup top-up payment and interest-free loan subsidies that were far more significant than the listed marketing, legal, and localization expenses; (b) that the growing undisclosed subsidies were crippling Gemini; and (c) that Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

108. The Registration Statement further described "international expansion" as a key pillar of Gemini's growth strategy:

> To increase MTUs on our platform, we are investing in targeted retail marketing strategies, an expanded institutional sales force, international expansion, and continued product development, all while remaining obsessively focused on improving our product experience:
>
> * * *
>
> - *Expand internationally*: Geographic expansion into new markets and jurisdictions will further amplify our global reach, creating a robust foundation for sustained growth. Crypto is inherently global, and operates

> 24/7, underpinning our focus on investments in both the European and Asia-Pacific ("APAC") regions.

109. The statements identified in Paragraph 108 above were materially misleading when made because they omitted: (a) that Gemini had not and was not investing in building actual international businesses but instead was operating mere fronts that routed crypto transactions to the US; and (b) that Gemini's then-existing international business was reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans.

110. Similarly, the Registration Statement assured that international expansion was a key part of Gemini's then-current "multifaceted go-to-market" strategy:

> **Go to Market**
>
> We pursue a multifaceted go-to-market strategy centered on expanding and retaining our global user base, enhancing product depth, and fostering industry partnerships. We combine targeted retail marketing, institutional outreach, ***international expansion***, and proactive product development, all underpinned by our commitment to a secure and seamless user experience.

111. The statements identified in Paragraph 110 above were materially misleading when made because: (a) Gemini's go-to-market strategy was not "centered on expanding and retaining [its] global user base," but rather was centered on its US user base; (b) the statements omitted that Gemini had neither made the political commitment nor the operational investment to build actual international businesses, but instead was operating mere fronts that routed crypto transactions to the US; and (c) the statements omitted that Gemini's then-existing international business was reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans.

112. And, the Registration Statement similarly confirmed that international expansion played a large role in "expanding and engaging" Gemini's user base, and touted recent international crypto licenses:

> ***Expanding and Engaging Our User Base***
>
> Our growth combines digital channels including social media, search optimization, and user referrals with out-of-home brand campaigns like "Go Where Dollars Won't." We strategically allocate our marketing budget between brand awareness and performance marketing channels, ensuring both broad market presence and efficient user acquisition. To strengthen relationships with institutional customers and cultivate high-net-worth partnerships, we maintain a presence at key industry conferences and events.
>
> * * *
>
> *International Growth*: By extending our operational footprint into key global markets, we aim to serve the inherently borderless nature of crypto. In particular, our international expansion plans have focused on obtaining our newly-issued MiCA and MiFID licenses in the E.U., converting the in-principle approval that we obtained from the Monetary Authority of Singapore into a full Major Payments Institution license, offering derivatives products to UK high net worth individuals, offering tokenized equities to Gemini users in the E.U., establishing licensed spot and derivatives exchanges in Australia, and establishing licensed spot and derivatives exchanges in Bermuda (intended to serve international users not residing in a jurisdiction where we have a regulated entity). Our international expansion plans, including the timing thereof, are still being formulated and are uncertain, with the predominant factors guiding such expansion including a region's competitive and regulatory landscape, crypto adoption rates, and unique opportunities that arise. Gemini's intended expansions into Europe and APAC align with the 24/7 trading environment and broaden our reach to users worldwide.

113. The statements identified in Paragraph 112 above were materially false and misleading when made because: (a) the statements omitted that Gemini paid enormous but undisclosed top-up payments and other subsidies to its UK, EU, and Singapore operations, without which they could not operate; (b) the statements omitted that Gemini had neither made the political commitment nor the operational investment to build actual international businesses, but instead was operating mere fronts that routed crypto transactions to the US; and (c) Gemini's international expansion plans did not hinge on "a region's competitive and regulatory landscape, crypto adoption rates, and unique opportunities that arise" but rather Gemini's ability and willingness to pay increasing subsidies.

114. In several other places, the Registration Statement repeatedly assured investors that Gemini's international presence would grow, not be slashed to irrelevance:

- We currently have subsidiaries in the United States and abroad. ***We plan to enter into or increase our presence in additional markets around the world***;
- We intend to continue to make investments in our business, including … ***expanding our international operations***;
- We also use MTUs [monthly transacting users] to help evaluate the performance of our growth initiatives, including our efforts to acquire new retail and institutional users, ***expand internationally,*** and broaden the number and type of crypto assets supported on our platform;
- To increase MTUs on our platform, we are focused on … Expanding internationally;
- As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase
- Our operating expenses may increase in the future as we continue to … expand our international business;
- ***As we continue to expand our business and user base outside the United States***…; and
- we may incur significant expenses as a result of our international expansion.

115. The statements identified in Paragraph 114 above were materially false and misleading when made because they omitted: (a) that Gemini's international businesses were reliant on undisclosed intragroup top-up payment and interest-free loan subsidies that were far more significant than the listed marketing, legal, and localization expenses; (b) that the growing undisclosed subsidies were crippling Gemini; and (c) that Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

116. The Registration Statement further stated, with respect to trading volume:

> We define Trading Volume as the total U.S. dollar equivalent value of spot matched trades transacted between a buyer and seller through our platform during the period of measurement. Trading Volume represents the product of the quantity of assets transacted and the trade price at the time the transaction was executed. ***As trading activity directly impacts transaction revenue, we believe this measure is a reflection of liquidity of our order book and the underlying growth of the cryptoeconomy.***

117. The statements identified in Paragraph 116 above were materially false and misleading when made because they omitted: (a) that Gemini was shifting to a much lower margin mix and therefore the mix of customers, rather than trading volume itself, was what "directly impact[ed] transaction revenue"; (b) that Gemini's international businesses were reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans, without which they could not survive; (c) the growing undisclosed subsidies were crippling Gemini; and (d) Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

118. The Registration Statement further stated, with respect to MTUs:

> We view MTUs as a core indicator of platform engagement and overall business health, and MTUs also serve as a top-of-funnel metric in our internal financial forecasting processes. ***MTUs directly correlate with other key performance indicators, such as Trading Volume, and revenue, particularly because transaction-based fees represent the majority of our revenue.*** For example, for the six months ended June 30, 2025, approximately 65.5% of our revenue was derived from transaction fees. As MTUs increase, we generally experience increased transaction activity, which leads to increased fee-based revenue. In turn, this generally supports higher gross margin and contributes to increases in net income. We also use MTUs to help evaluate the performance of our growth initiatives, including our efforts to acquire new retail and institutional users, expand internationally, and broaden the number and type of crypto assets supported on our platform.

* * *

> Overall, we believe MTUs provide a meaningful measure of the breadth of active user engagement with our products, and we use this metric, among others, to evaluate the effectiveness of our user acquisition, product expansion, and engagement strategies.

119. The statements identified in Paragraph 118 above were materially false and misleading when made because, according to Defendants' own definition of the metric, MTUs were *not* directly correlated with revenue precisely because users did not have to actually *transact* or generate *any revenue* in order to be counted as MTUs.

120. The Registration Statement presented investors with a five-person executive team, consisting of Tyler Winklevoss, Cameron Winklevoss, Beard, Chen, and Meade, and stated:

> Our executive team has an extensive track record of founding and building successful ventures, along with operating experience at blue-chip financial services and technology firms. We believe this depth of experience gives our executive team an edge for both embracing disruptive technologies as they emerge and building a foundation of compliance and security that positions Gemini for long-term success.

121. The statements identified in Paragraph 120 above were materially misleading when made because they omitted: (a) that Gemini then considered its executive team, other than the Winklevoss Defendants, to be non-essential; (b) that the Winklevoss Defendants, who dominated Gemini, were then considering terminating all other members of the C-Suite; and (c) that Beard in particular, who oversaw the failing international operations and was the architect of the model funneling millions of dollars of hidden subsidies to those operations, was blamed for their failure.

122. The Registration Statement further stated with respect to the executive team that:

> Due to the nascent nature of digital assets, the pool of qualified talent is extremely limited, particularly with respect to executive talent…. To attract and retain key personnel, we incur significant costs, including salaries and benefits and equity incentives. Even so, these measures may not be enough to attract and retain the personnel we require to operate our business effectively. The loss of even a few key employees, or an inability to attract, retain and motivate additional highly skilled employees required for the growth of our business could adversely impact our operating results and impair our ability to grow.

123. The statements identified in Paragraph 122 above were materially misleading when made because they omitted that Gemini then considered its executive team, other than the Winklevoss Defendants, to be non-essential, as evidenced by the fact that Beard, Chen, and Meade were summarily terminated months later.

124. The Registration Statement further disclosed that Beard and Meade participated in the Gemini Space Station Senior Executive Severance Plan, and Chen in the Gemini Space Station Executive Severance Plan and that the purpose of those plans was to "help retain qualified Eligible Executives [ ], maintain a stable work environment and provide economic security."

125. The statements identified in Paragraph 124 above were materially misleading when made because they gave the misleading impression that Gemini's strategy was to retain the non-Winklevoss members of its executive team, rather than terminate all of them and consolidate power with the Winklevoss Defendants, as happened mere months later.

126. The Registration Statement stated, under "Key Factors Affecting Our Performance":

> We expect competition across our products and services to further intensify in the future as existing and new competitors introduce new products and services or enhance their value propositions for customers. As the industry matures, fee pressures may emerge over time. We intend to continue innovating to drive new products and services while delivering a premier user experience and maintaining our position as a trusted brand in the crypto space to offset the effects of these competitive pressures.

127. The statements identified in Paragraph 126 above were materially false and misleading when made because: (a) fee pressures had already "emerge[d]" and been quantified, including a 61% blended take-rate decline over eighteen months, and, by Gemini's own quantification, approximately $13.5 million of exchange revenue erased by lower blended retail fee rates in FY2024 as compared to FY2023, and a further $7.2 million erased in the first half of 2025 as compared to the first half of 2024, and a $1.5 million increase in incentive credits provided

to market makers (between 1H2024 and 1H2025) that further reduced net trading fees; and (b) first-half 2025 exchange revenue fell 14% on 49% volume growth.

### B. September 29, 2025: Blog Post Regarding International Business

128. On September 29, 2025, Gemini published a blog post on its website touting its international business segment in the United Kingdom, and the opening of the "First Permanent UK Office in London." Specifically, Gemini announced its London office as a "*major step in [Gemini's] European expansion*" and that the London branch would "provide a space for the Gemini Team to innovate, collaborate and ***grow headcount in one of the world's fastest-evolving crypto markets***."

129. The statements referenced in Paragraph 128 were materially false and misleading because they omitted that: (a) the UK business's ability to "grow headcount" depended entirely on funding from undisclosed intragroup agreements and not on the business's ability to generate revenue from MTUs; (b) due to the fee compression the Company was facing, it would be unlikely to be able to keep funding the UK business through the intragroup agreements; (c) the UK crypto market was not "one of the world's fastest-evolving crypto markets" because the entire UK market consisted of less than 5,000 MTUs and had not generated any profit in any year of operation, facts which were known to Gemini and admitted to foreign regulators but hidden from US investors; and (d) as a result, Gemini omitted that there was a materially increased risk that the UK business could not survive.

### C. October 8, 2025: Australia Expansion Announcement

130. On October 8, 2025, Gemini published a post on its website announcing "Gemini's expansion in Australia" and painting the event as a "***major step forward in our long-term Asia Pacific growth journey***." Specifically, the Company stated:

> Expanding in Australia is not just about access – it's about trust, transparency, and empowering Australians with the tools to participate in the next wave of digital innovation. This is just the beginning.

131. The statements referenced in Paragraph 130 were materially false and misleading because they omitted that: (a) Gemini's Australian entity, Gemini Intergalactic Australia, PTY Ltd., had never conducted any meaningful actual business, rendering the touted "expansion" illusory; (b) Gemini's existing international operations were sustained not by customer revenue but by undisclosed intragroup top-up payments and other subsidies which Gemini could not afford to continue paying, and any Australian operation would likewise require such subsidies; (c) due to the fee compression the Company was facing, it would be unlikely to keep funding subsidized international operations; and (d) as a result, there was a materially increased risk that the Australian business would never launch.

132. Analysts repeated the false impression of international upside touted by Exchange Act Defendants. For example, an October 7, 2025 Rosenblatt Securities report described international expansion as a "near-term" positive catalyst that could "re-rate the stock" and provide upside beyond current estimates. That same day, analysts at Evercore ISI reiterated that Gemini's "[i]nternational expansion through new licenses and APAC/Europe marketing efforts offers Gemini the potential to more than double retail TAM." Similarly, a November 11, 2025 Morgan Stanley report called international expansion a "lever [for Gemini] to pull" to increase results.

### D. November 10, 2025: 3Q25 Shareholder Letter

133. On November 10, 2025, after market close, Gemini filed a quarterly report on Form 10-Q with the SEC, announcing its financial results for the third fiscal quarter of 2025 ended September 30, 2025 ("3Q25 10-Q"). Gemini also filed a Form 8-K with the SEC attaching "A Letter to Shareholders" regarding its 3Q25 results (the "3Q25 Shareholder Letter").

134. The 3Q25 Shareholder Letter stated:

> The Gemini Credit Card delivered record performance, surpassing 100,000 open accounts and more than $350 million in quarterly transaction volume, more than doubling quarter-over-quarter. Together, these results reflected our strongest quarter of user acquisition in over three years.
>
> The company built momentum for its next stage of growth this quarter by launching new Gemini Credit Card features and introducing the Gemini Wallet, a self-custody wallet designed for crypto users and developers alike. We also broadened our global footprint by launching in Australia and securing our MiCA (Markets in Crypto-Assets Regulation) license in Europe. Together with our previously obtained MiFID license, we offer staking, derivatives and tokenized stocks to customers across the European Union under a regulated framework.
>
> * * *
>
> Credit card revenue was $8.5 million, an increase of $3.7 million Q/Q, reflecting continued momentum in cardholder adoption and spend. New Card Sign-Ups totaled 64 thousand in the quarter, compared to 17 thousand in Q2 and 8 thousand for all of 2024. This strong growth contributed to higher receivable balances of $150.6 million in Q3, up 61% Q/Q. The Gemini Credit Card continues to serve as a powerful on-ramp for new customers, deepening engagement across our ecosystem while driving recurring, transaction-based revenue.
>
> * * *
>
> We expect steady growth in Monthly Transacting Users, with a medium-term outlook for 20-25% compound annual growth. We anticipate growth will be driven by continued engagement from existing customers and expansion of our retail base through the Gemini Credit Card, which introduces new users to the platform and provides a natural pathway into trading and onchain activity. Our focus remains on deepening customer relationships and increasing multi-product engagement over time.

135. The statements referenced in Paragraph 134 were materially false and misleading because they omitted that: (a) Gemini's emphasis on Card Sign-Ups as a KPI was exaggerated and Card Sign-Ups were not a reliable indicator of "future card revenue" because, as defined by Gemini, the metric included customers who had merely been approved to open accounts but not actually activated or used their card, and because Card Sign-Ups were cyclical and correlated with crypto prices (*i.e.*, the value of the incentive rewards Gemini paid to entice customers to sign up declined as crypto prices declined); (b) Gemini Credit Card users were automatically counted as

MTUs, regardless of whether they used, or intended to use, the Gemini platform to manage their crypto accounts, and this inflated the number of MTUs reported and meant that the credit card did not provide a "natural pathway" into trading; and (c) "broaden[ing]" Gemini's "global footprint" implied Gemini's strategy for its "next phase of growth" included its then-existing international business; however, at this time, the international business was failing and not a viable avenue of business growth. CW1 was told by European colleagues that the European audience was small, and there was not much focus on those markets by the Company because the economics were poor.

### E. November 10, 2025: The 3Q25 Earnings Call

136. On the same day, November 10, 2025, also after market close, Gemini held a conference call to discuss its financial results for 3Q25 (the "3Q25 Earnings Call").

137. During the 3Q25 Earnings Call, Defendants touted their progress in expanding Gemini's international operations without signaling any likelihood that a change in macro conditions could cause the Company to reverse course in the coming months. For example, Defendant Cameron Winklevoss said that Defendants' progress on international operations demonstrated that Gemini's business model was sound, stating, *inter alia*:

> [W]e broadened our global footprint by launching in Australia and securing our MiCA license in Europe, enabling us to offer staking, derivatives and tokenized stocks to customers across the European Union under a regulated framework. ***We believe this performance reinforces the strength of our model and the foundation that will continue to power Gemini's long-term growth.***

138. Defendant Tyler Winklevoss discussed Gemini's international expansion efforts in similarly positive terms and gave no hint that Defendants might reverse course in the coming months, stating, inter alia: "[i]n Q3, we advanced our mission across five key areas that demonstrate the strength of this model: ***one, expanding our regulated global footprint***."

139. The statements referenced in Paragraphs 137 and 138 were materially false and misleading because: (a) the international operations were then weakening, not strengthening, and

were not then "power[ing] Gemini's long-term growth"; (b) the statements omitted that Gemini's international operations relied upon large top-up subsidies from the US entities that were concealed from US investors, without which the international operations could not survive; (c) the statements omitted that Gemini had neither developed the political inroads nor operational infrastructure necessary to capture meaningful international business; (d) the statements omitted that Gemini's international operations Defendants touted generated de minimis customer revenue and were kept afloat only by undisclosed intragroup top-up payments and other subsidies, which supplied 81% of the UK exchange entity's turnover and approximately 90% of the EU exchange entity's turnover; (e) far from "reinforc[ing] the strength of [Gemini's] model," the international operations were a growing drain on the Company amid the 61% collapse of its blended take rate; (f) Defendants were then diverting significant resources to a prediction-markets initiative at the expense of international expansion; and (g) the statements omitted that, as a result, there was a materially increased risk that the international operations could not survive, which came to fruition when they were gutted less than three months later.

140. Also during the 3Q25 Earnings Call, Cameron Winklevoss touted metrics purportedly demonstrating that Gemini's business and growth were strong, stating, *inter alia*:

> Across the business, we achieved some of our strongest growth milestones in recent years. Trading volumes reached $16.4 billion, a multiyear quarterly high, primarily driven by expanding institutional activity and deeper engagement across the platform. The Gemini Credit Card delivered record performance, surpassing 100,000 open accounts and more than $350 million in quarterly transaction volume, more than doubling quarter-over-quarter. Together, these results reflected our strongest quarter of user acquisition in over three years and underscored the growing reach of our ecosystem.

141. The statements referenced in Paragraph 140 above were materially false and misleading because: (a) Gemini's $16.4 billion in trading volume was not driven by "deeper engagement across the platform," as $14.6 billion, or 89%, of that trading volume was institutional

market-maker flow that was predominantly cyclical due to a rally in crypto prices and which volume fell precipitously in the subsequent quarters; and (b) the statements regarding Gemini's 100,000 open credit card accounts and $350 million in quarterly transaction volume omitted that credit card sign-ups were cyclical and correlated with crypto prices (*i.e.*, the value of the incentive rewards Gemini paid to entice customers to sign up declined as crypto prices declined).

142. Also during the 3Q25 Earnings Call, COO Beard, on behalf of Gemini, discussed Gemini's progress in achieving international expansion through its licensing efforts, including entry into the Australian market (from which it would abruptly withdraw just months later). Among other representations, Beard stated:

> [W]e made several improvements to the business to further advance our mission and improve our operations. . . . Let me start with our expanding global footprint, where we made important progress in strengthening Gemini's goal of being a trusted regulated partner around the world. We advanced licensing and registrations in key markets when we received our MiCA license from the Malta Financial Services Authority, enabling us to offer certain secure, reliable crypto services across all 30 European countries and jurisdictions. Following the close of Q3, we launched in Australia after obtaining AUSTRAC registration in August and completed key payments integrations to streamline onboarding in the region. . . . Together, these milestones expand Gemini's license footprint across major global markets and strengthen our ability to operate under clear regulated frameworks. They also demonstrate how our commitment to compliance continues to open new opportunities for both retail and institutional customers.

143. The statements referenced in Paragraph 142 were materially false and misleading because: (a) the licenses and registrations touted did not "open new opportunities" because Gemini's international operations generated de minimis customer revenue and depended on undisclosed intragroup top-up payments and other subsidies to remain solvent; (b) the Australian launch was illusory, as there is no evidence that Gemini's Australian entity ever conducted any actual business and Gemini abruptly withdrew from Australia months later; and (c) the statements

omitted that, as a result, there was a materially increased risk that the international operations would not survive.

144. Later during the 3Q25 Earnings Call, CFO Chen, on behalf of Gemini, represented to investors that Gemini expected increasing revenues in the form of increased MTUs, stating *inter alia*:

> Overall, we believe that our balance sheet remains healthy with ample liquidity and diversified funding to support growth across our key products. Looking ahead, our focus remains on driving disciplined growth, improving capital efficiency and maintaining flexibility to invest behind our highest conviction opportunities. Starting with our medium-term framework, we continue to expect monthly transacting users to grow at a 20% to 25% compound rate over the medium term and that growth to be supported by a mix of new retail customers coming through our credit card on [sic] exchange and expanding engagement from existing customers across trading, staking and onchain activity.

145. The statements referenced in Paragraph 144 were materially false and misleading because: (a) Gemini's balance sheet and liquidity were neither healthy nor diversified, as its core crypto exchange was failing and the Company was majorly reliant on related-party crypto loans from WCF to provide liquidity for its general operations; (b) the projected 20% to 25% compound MTU growth lacked a reasonable basis and omitted that international expansion, a growth initiative Gemini told investors it used MTUs to evaluate, was slated for retrenchment rather than growth, and that exiting the UK, EU, and Australian markets would eliminate the MTUs those operations supplied, and that the Company included users who abandoned its platform but left pennies behind in their accounts as MTUs from which it derived its projected MTU growth; (c) the projected 20% to 25% compound MTU growth lacked a reasonable basis and omitted that approximately 50,000 of the 64,000 net new MTUs Gemini added in 3Q25 were attributable to Gemini's no-fee credit card, as Defendants acknowledged during the 3Q25 Earnings Call ("[m]ore than 55% of newly acquired U.S. transacting users across our products in Q3 first originated

through card onboarding") and as Gemini's Q1 2026 earnings presentation belatedly confirmed, those sign-ups were driven by rewards and promotions and therefore susceptible to cyclicality correlated to crypto prices (*i.e.*, the value of those incentive rewards declines as crypto prices decline); (d) the touted "expanding engagement from existing customers across trading, staking and onchain activity" omitted that retail engagement was already eroding; (e) the statements omitted that Gemini was far more vulnerable to a downturn in Bitcoin even if it could increase MTUs, because it was making large undisclosed top-up payments to prop up foreign operations; and (f) as a result, the statements omitted that Gemini was poised for an expensive and disruptive restructuring that would undermine the represented "medium-term framework."

### F. <u>November 12, 2025</u>: Cameron Winklevoss Tweet

146. On November 12, 2025, Cameron Winklevoss took to X.com to retweet Tyler Winklevoss's tweet reiterating Defendants' commitment to the European market: "We are going to mainstream Bitcoin in Europe."

147. The statement referenced in Paragraph 146 was materially false and misleading because it omitted that: (a) Gemini's EU exchange entity earned only €717,175 in customer fees in fiscal 2024, with approximately 90% of revenue consisting of undisclosed intragroup top-up payments; (b) Gemini's EU units could not operate without the subsidy payments; (c) Gemini was then facing fee compression that made it even more difficult to keep paying the growing subsidies to prop up foreign operations; (d) Defendants were then preparing to reorient Gemini around its US prediction-markets business rather than European expansion; and (e) as a result, there was a materially increased risk that Gemini would exit the EU market, as it announced less than three months later.

### G. <u>November 13-14, 2025</u>: Bitcoin Amsterdam Conference

148. Three days later, on November 13, 2025, the Winklevoss Defendants held a "fireside chat" at the Bitcoin Amsterdam 2025 conference to promote their European growth initiatives. In that talk, Cameron Winklevoss told investors that European regulatory reforms made Europe an attractive market, especially because it could offer lucrative perpetual futures there:

> Europe got some things right with MiCA in a big way. And so, it's like a federal framework for crypto, spot crypto in all of Europe. We got our MiCA license this summer and also got a MiFID license. So, we have perpetuals and spot trading in all of Europe. So, they beat the U.S. to the regulatory federal path. But I think that, generally speaking, like, you always need more access to Bitcoin. And that's the whole thesis behind Treasury and what we're excited about, trying to build the largest Treasury company in Europe so people can access this incredible asset.

149. The statements referenced in Paragraph 148 were materially false and misleading because the statements omitted that: (a) Gemini's EU exchange entity earned only €717,175 in customer fees in fiscal 2024, with approximately 90% of revenue consisting of undisclosed intragroup top-up payments; (b) Gemini's EU units could not operate without the subsidy payments; (c) Gemini was then facing fee compression that made it even more difficult to keep paying the growing subsidies to prop up foreign operations; (d) that Defendants were then preparing to reorient Gemini around its US prediction-markets business rather than European expansion; and (e) as a result, there was a materially increased risk that Gemini would exit the EU market, as it announced less than three months later.

150. At that same conference, Tyler Winklevoss emphasized that Europe was a large part of Gemini's future ambitions: "[W]e want to bring back the digital golden age and bring Bitcoin home to Europe.... I mean, if you think about it, US capital markets all basically draw back to the financial innovation that happened in this country many hundreds of years ago. It's pretty remarkable. So, we really want to make Bitcoin great here."

151. The statements referenced in Paragraph 150 were materially false and misleading because: (a) Gemini was not positioned to "bring Bitcoin home to Europe" or to "make Bitcoin great" in Europe, where its exchange entity earned less than €720,000 in annual customer fees and was reliant on undisclosed intragroup subsidies and interest-free loans; (b) the statements omitted that Gemini's EU units could not operate without the subsidy payments; (c) the statements omitted that Gemini was then facing fee compression that made it even more difficult to keep paying the growing subsidies to prop up foreign operations; (d) the statements omitted that Defendants were then preparing to reorient Gemini around its US prediction-markets business rather than European expansion; and (e) as a result, there was a materially increased risk that Gemini would exit the EU market, as it announced less than three months later.

152. The next day, on November 14, 2025, the Winklevoss Defendants gave another interview at Bitcoin Amsterdam 2025, where they again promoted the importance of providing crypto access to European customers. At the talk, the Winklevoss Defendants were asked whether they saw a unique opportunity for a Bitcoin treasury company in Europe. Tyler Winklevoss responded:

> I think treasury will be Europe's first treasury company, Bitcoin [digital asset treasury] DAT, and I think giving more access to Europeans to Bitcoin is important. So we are excited about that.

153. The statements referenced in Paragraph 152 were materially false and misleading because the statements omitted that: (a) Gemini's European operations were subsidized fronts that routed transactions to the United States, generated de minimis customer revenue, and could not operate without massive intra-company payments, capital injections and interest-free loans; (b) the intragroup subsidies were becoming more difficult to maintain as fees compressed; (c) Gemini was then considering winding down European operations to shift focus to US prediction markets; and

(d) as a result, there was not only a materially increased risk but a likelihood that Gemini would exit the European market altogether.

## III. Corrective Disclosures Alleged with Respect to Exchange Act Claims

154. On February 5, 2026, Gemini issued a Regulation FD disclosure on Form 8-K, announcing it had published a blog post authored by its Co-Founders, Defendant Tyler Winklevoss and Defendant Cameron Winklevoss. Most importantly, it disclosed that it was abandoning the very international businesses that it had proclaimed months earlier to be vital to its expansion and growth plans "by exiting the UK, EU, and Australian markets." It also announced a rebranding to "Gemini 2.0" which would further emphasize its prediction markets, and layoffs of approximately 25% of its workforce, attributable in part to terminating workers in its to-be-shuttered foreign operations.

155. Defendants' disclosure that the Company was abandoning its international markets revealed that months of promises that those operations were levers for growth were false and misleading. With this revelation, the artificial inflation caused by those misrepresentations was removed from Gemini securities, resulting in an 8.72% decrease in the value of Gemini's Class A common stock, or $0.64 per share, to close at $6.70 per share on February 5, 2026. Notably, this decline understates the amount of artificial inflation, as the market interpreted the first two items of the announcement – information regarding the launch of prediction markets and the cost savings of reducing headcount – as generally positive.

156. Following these disclosures, Evercore ISI downgraded the Company's stock from outperform to in line, and reduced its price target 33%, from $15.00 to $10.00, writing that "[o]ver time," Gemini 2.0 might prove positive, "but investors are more interested in growth given the early stage that the company and sector are both in….[and] today's announcement pushes out the timeline for GEMI's growth narrative, which was a key pillar to our near-term investment thesis."

157. Then, on February 17, 2026, Gemini issued a Current Report on Form 8-K, announcing the departure of COO Beard, CFO Chen, and CLO Tyler Meade. In their respective places, Danijela Stojanovic would serve as Interim CFO, Kate Freedman would assume the role of Interim General Counsel, and Defendant Cameron Winklevoss would handle Beard's revenue-generating responsibilities. The Company also offered "preliminary unaudited estimates" of its financial results for the fiscal year ended December 31, 2025, including net revenue of $165 million to $175 million and operating expenses of $520 million to $530 million, an increase of approximately 70% from the previous fiscal year. Gemini attributed this expense figure to "higher personnel-related costs," apparently referring to the departures of Beard, Chen, and Meade, three highly compensated executives: "The estimated increase in operating expenses is primarily due to higher personnel-related costs, including stock-based compensation, and investments in technology, general and administrative expenses and marketing investments to support the Company's strategic initiatives."

158. On this news, Gemini's stock price fell $0.975 per share, or 12.9%, to close at $6.585 per share on February 17, 2026.

159. On or around February 17, 2026, Defendants also updated the live version of the blog post referenced *supra* ¶154, adding language that explicitly tied Gemini's new priority of a prediction market to the termination of Chen, Beard, and Meade. This blog post stated: "Update: As part of the Gemini 2.0 transformation, we are making changes to our executive team and will be parting ways with Dan Chen (Chief Financial Officer), Tyler Meade (Chief Legal Officer), and Marshall Beard (Chief Operating Officer)."

160. In response to Gemini's revelations, several analysts announced reduced price targets for Gemini's common stock. For example, on February 17, 2026, Truist downgraded

Gemini common stock from buy to hold and reduced its price target 46%, from $13.00 to $7.00, expressly citing the Company's drastic headcount reduction, its abrupt exit from international markets, and "this morning's announcement (worse than expected net loss, CFO is leaving, etc.)" – expressly noting that the latter disclosure "could result in more investors becoming concerned about Gemini's solvency." On February 18, 2026, Needham & Co. reduced its price target 57%, from $23.00 to $10.00, writing that Gemini's February 17, 2026 announcement amounted to "a major leadership restructuring" and "worsened" expenses. On February 20, 2026, Rosenblatt reduced its price target 55%, from $26.00 to $11.50, writing "[j]ust after what at the time felt like a successful IPO, Gemini is now in full restructuring mode first with significant expense cuts earlier this month and now major [management] changes with the departure of its COO, CFO, and Chief Legal Officer."

161. Exchange Act Defendants, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. The market for Gemini's Class A common stock was open, well-developed, and efficient at all relevant times. Throughout the Class Period, Gemini's Class A common stock traded at artificially inflated prices, with the common stock closing high of $32.52 during the Class Period as a direct result of Exchange Act Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Gemini's Class A common stock relying upon the integrity of the market price for Gemini's Class A common stock, but which included the artificial inflation caused by these misrepresentations of material fact.

162. The economic loss suffered by Plaintiffs and other members of the Class was a direct result of Exchange Act Defendants' wrongful conduct, which inflated the price of Gemini's Class

A common stock and resulted in the subsequent declines in value when Exchange Act Defendants' prior false and misleading statements and omissions were revealed through the foregoing corrective disclosures. The declines in the price of Gemini Class A common stock pled herein were a direct result of the nature, extent, and impact of Exchange Act Defendants' prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price declines of Gemini Class A common stock negate any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Exchange Act Defendants' wrongful conduct.

## IV. The Winklevoss Defendants Engage in a Fraudulent Scheme to Recoup Funds from their Flailing Business

163. In violation of SEC Rules 10b-5(a) and (c), Defendants Tyler and Cameron Winklevoss engaged in a fraudulent scheme and course of conduct to take Gemini public in order to repay themselves for the massive injections of capital they fronted to keep the Company afloat, regain crypto assets pledged as collateral to third parties, and simultaneously strengthen their control of the Company.

164. In the years leading up to the IPO, Gemini operated at a significant loss. In order to continue operating, Gemini borrowed from third-party lenders at exceptionally high interest rates, which loans required exceptionally high collateral. Most importantly, Gemini took $116.5 million in loans from Galaxy at an interest rate of 11-12%, with a collateralization ratio of 145-155%.

165. The Winklevoss Defendants, through WCF, fronted the crypto used to collateralize the Galaxy loans. Although Gemini paid WCF 4-8% interest on the collateral fronted, that interest paled in the face of the massive increase in market value of the pledged crypto, Bitcoin and

Ethereum, which had skyrocketed but could not be monetized due to the collateral pledge. Thus, the Winklevoss Defendants were incentivized to do whatever it took to unlock that collateral.

166. A separate nine-figure WCF loan facility provided that, in the event of an IPO, the outstanding balance would convert into shares of Gemini stock at a 20% discount to the public offering price. The Winklevoss Defendants engineered the terms of the IPO so the conversion would be to Class B shares, which had 10 times the voting power of Class A common shares.

167. Pursuant to these terms, just before the IPO, Gemini converted approximately $695.6 million of WCF loans and convertible notes, plus accrued interest, into 31.1 million shares of Class B stock with super-voting rights at a price of $22.40 per share—20% lower than the $28/share retail investors paid. In other words, retail investors paid significantly more, but a staggering 94.7% of the voting power remained in the hands of the Winklevoss Defendants. Additionally, Class B shares can also be converted to Class A shares at a one-for-one ratio, meaning the Winklevoss Defendants had (and have) the power to convert their Class B shares into listed stock. They essentially turned stale, collateralized assets into ready money while relinquishing nothing but the tiniest amount of control over the Company.

168. Then, Gemini used cash from the IPO proceeds to repay the $116.5 million loan to Galaxy, freeing up the crypto assets that had been pledged as collateral.

169. For the Winklevoss Defendants' scheme to work, they had to plan the IPO at a time when it was most likely to succeed, both financially (at a time when market participants were particularly favorable toward cryptocurrencies) and with minimal regulatory scrutiny. Their aforementioned political contributions were used to ensure favor with US regulators. Cameron Winklevoss said that Gemini would not have been able to go public but for getting President Trump elected, and that their tactics might have landed them in jail with another administration.

## V. Additional Scienter Allegations Applicable to Exchange Act Claims

170. At all relevant times, Exchange Act Defendants acted with scienter. The facts alleged herein show that the Winklevoss Defendants either had actual knowledge of the true adverse facts they omitted to disclose and which contradicted their false or misleading statements or acted with reckless disregard of the false and misleading nature of those statements and omissions. The scienter of management-level employees, including each of the Winklevoss Defendants, is imputed to Gemini.

171. First, Exchange Act Defendants had actual information undermining their statements. Executives who reported to the Winklevoss Defendants, including Beard and Meade, had signed off on the foreign regulatory filings revealing the top-up subsidies Gemini used to prop up its international businesses. And, the Winklevoss Defendants had consolidated for themselves the power to fire the non-Winklevoss members of the executive team, so they knew those plans were under consideration at the same time they included assurances that steps were being taken to maintain the executive team.

172. Second, Exchange Act Defendants had access to information about performance. According to CW2, KPIs were reviewed in weekly leadership meetings, and were available internally on an analysis tool called Looker. Looker is an agentic business intelligence tool offered by Google. *See* https://cloud.google.com/looker. Additionally, Exchange Act Defendants, as the dominant control persons of the organization, had access to the foreign regulatory filings upon request to the extent they had not already reviewed copies of those filings.

173. Third, Exchange Act Defendants held themselves out as knowledgeable to analysts and investors about the misrepresented topics, and in particular the international businesses they spoke about so frequently. In the unlikely event that they did not have actual knowledge about the

true state of affairs of those organizations contradicting their public statements, they were reckless in not bothering to check the true facts before holding themselves out as knowledgeable.

174. Fourth, the Winklevoss Defendants had substantial motive and opportunity to misrepresent these facts. The Winklevoss Defendants did not merely stand to benefit from a successful IPO in the abstract way that every founder benefits from a liquidity event. They stood to and did recover $225,621,455.23 of their own cryptocurrency from a third-party lender's custody, and converted $695.6 million of demand-repayable insider debt into freely tradable public equity at a 20% discount. These benefits were received within twenty-seven days of the offering. These benefits were concrete, quantifiable, personal to the Winklevoss Defendants, and unavailable to Gemini's public shareholders. They were realized only because the Registration Statement omitted and misrepresented the material facts alleged above concerning fee compression, the hollowness of Gemini's international operations, and the deterioration of the Company's core exchange business.

175. The returned digital assets did not go to Gemini or to Gemini's public shareholders. They went entirely to WCF, a separate entity owned by the Winklevoss Defendants.

176. By using the misrepresentations alleged herein to accomplish the IPO, the Winklevoss Defendants extinguished a concrete personal risk that the collateral pledged could decline before it was returned.

177. Conversion of the $695.6 million drawn by Gemini from WCF under the Convertible Term Loans and Convertible Notes also delivered a nine-figure personal windfall to the Winklevoss Defendants. That amount automatically converted into Class B common stock at a 20% discount to the IPO price immediately prior to the IPO, or 31,055,951 Class B shares. The

conversion discount alone delivered WCF, and therefore the Winklevoss Defendants, an immediate windfall of $173,966,628, or 25% of principal.

178. That conversion also gave the Winklevoss Defendants a non-financial personal benefit. The Class B shares carried superior voting rights, consolidating the power and control of the Winklevoss Defendants.

179. As a result of these unique personal benefits conferred to the Winklevoss Defendants but not other investors through the IPO, they were personally motivated to make the misrepresentations and omissions in the Registration Statement, so as to ensure a successful IPO.

180. Viewed together, the related-party transactions reveal the IPO was a mechanism by which Gemini shifted the consequences of its financially distressed operations onto investors while simultaneously repaying and benefiting its related-party lenders. Specifically, investors supplied the cash that allowed Gemini to: (1) repay an expensive related-party debt obligation; (2) release the Winklevoss Defendants' corresponding crypto collateral; and (3) convert hundreds of millions of dollars of convertible notes and loans from WCF into super-voting equity for the Winklevoss Defendants at a steep, 20% discount. Thus, the IPO delivered significant economic value to the Company's insiders and related-party lender, but very little to the investing public. Put differently, the IPO enabled Gemini to replace expensive, insider-dependent financing with public capital — leaving investors to bear the risk of the Company's future, while the Winklevoss Defendants captured the immediate benefits of repayment, collateral release, and discounted equity conversion.

181. As the Winklevoss Defendants openly boasted: "[W]e were able to take Gemini public in September. That never would have been possible with Gary Gensler and the previous SEC regime…we had the first ever crypto summit at the US [ ] White House, and we all remarked

we said a year ago we were more likely to end up in the jail house than the White House." Accordingly, they knew the importance of generating political influence, and that they had not done so internationally.

182. Fifth, scienter is further supported by the core operations doctrine. Gemini acknowledged in the Registration Statement that international expansion is a "Key Factor Affecting Our Performance" and a pillar of the Company's growth strategy.

183. Sixth, the sheer scale and speed of the "Gemini 2.0" pivot, exiting three international markets, terminating 25% of the workforce, and removing three C-suite officers, all announced within four weeks of Exchange Act Defendants' final reassurances, compels the inference that Gemini's business was nothing more than a house of cards, gently propped for the purpose of closing an IPO that ultimately did little beyond unshackling the Winklevoss Defendants' personal cryptocurrency holdings from a circular financing arrangement with Galaxy and Gemini. Less than six months after pricing its IPO at $28/share, Gemini's stock closed at just $6.585 per share on February 17, 2026, an extraordinarily precipitous decline of over ***76.5%***.

184. The situation has not improved. On March 19, 2026, Gemini issued a letter to its shareholders announcing its financial results for the three months and fiscal year ended December 31, 2025. Citing its adoption of "AI," the Company revealed it had "reduced the size of [its] workforce by roughly 30% since the start of 2026," such that its headcount totaled just *445* employees as of March 1, 2026. Compared to its peak of approximately 1,100 employees in 2022, Gemini's headcount declined some ***59.5%***.

185. Then, in conjunction with the announcement of its financial results for the three months ended March 31, 2026, on May 14, 2026, Gemini announced it had entered into a private placement with WCF whereby WCF would purchase 7,142,857 shares of the Company's Class A

common stock at a price of $14/share, for an aggregate value of $100 million. WCF paid for the shares with approximately 1,258 BTC. In response, an analyst at Evercore ISI was quoted as saying: "Were it not for the founders' $100 million strategic investment, we think Gemini would likely be down on the print as key metrics like user and revenue reacceleration fell well short of pre-IPO expectations." As these repeated interventions clearly demonstrate, Gemini is (and was at the time of its IPO) incapable of functioning as a going concern without the financial "backing" of WCF and the Winklevoss Defendants.

186. This $100 million private placement also underscores why the Winklevoss Defendants were so uniquely motivated to close the IPO: by closing the IPO and re-taking custody of the BTC and ETH from Galaxy, they were able to continue to fund Gemini's continued operations.

187. Just days ago, on August 17, 2026, Gemini's Class A common stock sank to its lowest price ever, trading at just $3.38/share, a staggering decline of over ***87.9%*** from its $28 IPO price. Ultimately, Gemini was not so much a business as it was a machine that burned money.

## SECURITIES ACT CLAIMS

### I. Factual Allegations Specific to the Securities Act Claims

188. On February 14, 2025, Gemini filed a confidential draft registration statement with the SEC. Gemini received multiple rounds of feedback from the SEC regarding the draft registration statement and filed multiple amendments. The SEC kept the draft registration statement, amendments thereto, and related correspondence confidential, and they were not available to public investors until after the IPO.

189. On August 15, 2025, Gemini filed its initial Registration Statement for the IPO with the SEC on Form S-1. That registration statement was subsequently amended via Form S-1/A

filings on August 21, 2025, September 2, 2025, September 9, 2025, and September 10, 2025, and was declared effective on September 11, 2025.

190. On September 12, 2025, pursuant to the Registration Statement, Gemini and selling stockholders sold 15,937,501 shares of the Company's Class A common stock to the public for $28.00 per share, raising, before expenses, approximately $437.2 million for the Company. These shares began publicly trading on the NASDAQ under the ticker symbol "GEMI."

191. On September 15, 2025, Gemini filed the already-disseminated IPO Prospectus with the SEC on Form 424B4. The Prospectus had previously been filed as the body of the Registration Statement.

192. The Registration Statement discouraged investors from conducting their own investigation and specifically warned them not to rely on sources other than the Prospectus:

> We, the selling stockholders and the underwriters have not authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectus we have prepared or that has been prepared on our behalf or to which we have referred you. We, the selling stockholders, and the underwriters take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you.

## II. Securities Act Materially False or Misleading Statements or Omissions

193. Gemini's Registration Statement makes clear that the Company's mission is to "connect [customers] into the frontier of crypto and grow this frontier into the mainland…. And our mission is to do this for anyone, ***anywhere in the world***." It described Gemini's cryptocurrency exchange as its "core...product," and explained that the Company was founded to be a ***global*** cryptocurrency exchange, stating *inter alia*:

> Gemini was founded in 2014 to be the most trusted, secure, and easy way to buy, sell, and store crypto assets. As of July 31, 2025, we serve approximately 549,000 MTUs and approximately 10,000 institutions ***in over 60 countries***, with over $21 billion of assets on our platform, over $285 billion in lifetime trading volume, and over $830 billion in transfers processed on our platform.

194. The statements identified in Paragraph 193 above were materially misleading when made because they omitted: (a) that Gemini's international businesses were reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans, without which they could not survive; (b) the growing undisclosed subsidies were crippling Gemini; and (c) Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

195. The Registration Statement described "International Expansion" as a "Key Factor Affecting Our Performance." Specifically, it stated:

> *International Expansion*
>
> Our future growth depends in part on our ability to expand into new markets and jurisdictions. Expansion of our product offerings and user base into new geographies will require increased costs related to marketing, legal expenses and localization of product features.

196. The statements identified in Paragraph 195 above were materially misleading when made because they omitted: (a) that Gemini's international businesses were reliant on undisclosed intragroup top-up payment and interest-free loan subsidies that were far more significant than the listed marketing, legal, and localization expenses; (b) that the growing undisclosed subsidies were crippling Gemini; and (c) that Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

197. The Registration Statement further described "international expansion" as a key pillar of Gemini's growth strategy:

> To increase MTUs on our platform, we are investing in targeted retail marketing strategies, an expanded institutional sales force, international expansion, and

> continued product development, all while remaining obsessively focused on improving our product experience:
>
> * * *
>
> - *Expand internationally*: Geographic expansion into new markets and jurisdictions will further amplify our global reach, creating a robust foundation for sustained growth. Crypto is inherently global, and operates 24/7, underpinning our focus on investments in both the European and Asia-Pacific ("APAC") regions.

198. The statements identified in Paragraph 197 above were materially misleading when made because they omitted: (a) that Gemini had not and was not investing in building actual international businesses but instead was operating mere fronts that routed crypto transactions to the US; and (b) that Gemini's then-existing international business was reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans.

199. Similarly, the Registration Statement assured that international expansion was a key part of Gemini's then-current "multifaceted go-to-market" strategy:

> **Go to Market**
>
> We pursue a multifaceted go-to-market strategy centered on expanding and retaining our global user base, enhancing product depth, and fostering industry partnerships. We combine targeted retail marketing, institutional outreach, ***international expansion***, and proactive product development, all underpinned by our commitment to a secure and seamless user experience.

200. The statements identified in Paragraph 199 above were materially misleading when made because: (a) Gemini's go-to-market strategy was not "centered on expanding and retaining [its] global user base," but rather was centered on its US user base; (b) the statements omitted that Gemini had neither made the political commitment nor the operational investment to build actual international businesses, but instead was operating mere fronts that routed crypto transactions to the US; and (c) the statements omitted that Gemini's then-existing international business was

reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans.

201. And, the Registration Statement similarly confirmed that international expansion played a large role in "expanding and engaging" Gemini's user base, and touted recent international crypto licenses:

> ***Expanding and Engaging Our User Base***
>
> Our growth combines digital channels including social media, search optimization, and user referrals with out-of-home brand campaigns like "Go Where Dollars Won't." We strategically allocate our marketing budget between brand awareness and performance marketing channels, ensuring both broad market presence and efficient user acquisition. To strengthen relationships with institutional customers and cultivate high-net-worth partnerships, we maintain a presence at key industry conferences and events.
>
> * * *
>
> *International Growth*: By extending our operational footprint into key global markets, we aim to serve the inherently borderless nature of crypto. In particular, our international expansion plans have focused on obtaining our newly-issued MiCA and MiFID licenses in the E.U., converting the in-principle approval that we obtained from the Monetary Authority of Singapore into a full Major Payments Institution license, offering derivatives products to UK high net worth individuals, offering tokenized equities to Gemini users in the E.U., establishing licensed spot and derivatives exchanges in Australia, and establishing licensed spot and derivatives exchanges in Bermuda (intended to serve international users not residing in a jurisdiction where we have a regulated entity). Our international expansion plans, including the timing thereof, are still being formulated and are uncertain, with the predominant factors guiding such expansion including a region's competitive and regulatory landscape, crypto adoption rates, and unique opportunities that arise. Gemini's intended expansions into Europe and APAC align with the 24/7 trading environment and broaden our reach to users worldwide.

202. The statements identified in Paragraph 201 above were materially false and misleading when made because: (a) the statements omitted that Gemini paid enormous but undisclosed top-up payments and other subsidies to its UK, EU, and Singapore operations, without which they could not operate; (b) the statements omitted that Gemini had neither made the political

commitment nor the operational investment to build actual international businesses, but instead was operating mere fronts that routed crypto transactions to the US; and (c) Gemini's international expansion plans did not hinge on "a region's competitive and regulatory landscape, crypto adoption rates, and unique opportunities that arise" but rather Gemini's ability and willingness to pay increasing subsidies.

203. In several other places, the Registration Statement repeatedly assured investors that Gemini's international presence would grow, not be slashed to irrelevance:

- We currently have subsidiaries in the United States and abroad. ***We plan to enter into or increase our presence in additional markets around the world***;
- We intend to continue to make investments in our business, including … ***expanding our international operations***;
- We also use MTUs [monthly transacting users] to help evaluate the performance of our growth initiatives, including our efforts to acquire new retail and institutional users, ***expand internationally,*** and broaden the number and type of crypto assets supported on our platform;
- To increase MTUs on our platform, we are focused on … Expanding internationally;
- As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase
- Our operating expenses may increase in the future as we continue to … expand our international business;
- ***As we continue to expand our business and user base outside the United States***…; and
- we may incur significant expenses as a result of our international expansion.

204. The statements identified in Paragraph 203 above were materially false and misleading when made because they omitted: (a) that Gemini's international businesses were

reliant on undisclosed intragroup top-up payment and interest-free loan subsidies that were far more significant than the listed marketing, legal, and localization expenses; (b) that the growing undisclosed subsidies were crippling Gemini; and (c) that Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

205. The Registration Statement further stated, with respect to trading volume:

> We define Trading Volume as the total U.S. dollar equivalent value of spot matched trades transacted between a buyer and seller through our platform during the period of measurement. Trading Volume represents the product of the quantity of assets transacted and the trade price at the time the transaction was executed. ***As trading activity directly impacts transaction revenue, we believe this measure is a reflection of liquidity of our order book and the underlying growth of the cryptoeconomy.***

206. The statements identified in Paragraph 205 above were materially false and misleading when made because they omitted: (a) that Gemini was shifting to a much lower margin mix and therefore the mix of customers, rather than trading volume itself, was what "directly impact[ed] transaction revenue"; (b) that Gemini's international businesses were reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans, without which they could not survive; (c) the growing undisclosed subsidies were crippling Gemini; and (d) Gemini had neither developed the infrastructure nor made the political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products.

207. The Registration Statement presented investors with a five-person executive team, consisting of Tyler Winklevoss, Cameron Winklevoss, Beard, Chen, and Meade, and stated:

> Our executive team has an extensive track record of founding and building successful ventures, along with operating experience at blue-chip financial services and technology firms. We believe this depth of experience gives our executive team

> an edge for both embracing disruptive technologies as they emerge and building a foundation of compliance and security that positions Gemini for long-term success.

208. The statements identified in Paragraph 207 above were materially misleading when made because they omitted: (a) that Gemini then considered its executive team, other than the Winklevoss Defendants, to be non-essential; (b) that the Winklevoss Defendants, who dominated Gemini, were then considering terminating all other members of the C-Suite; and (c) that Beard in particular, who oversaw the failing international operations and was the architect of the model funneling millions of dollars of hidden subsidies to those operations, was blamed for their failure.

209. The Registration Statement further stated with respect to the executive team that:

> Due to the nascent nature of digital assets, the pool of qualified talent is extremely limited, particularly with respect to executive talent…. To attract and retain key personnel, we incur significant costs, including salaries and benefits and equity incentives. Even so, these measures may not be enough to attract and retain the personnel we require to operate our business effectively. The loss of even a few key employees, or an inability to attract, retain and motivate additional highly skilled employees required for the growth of our business could adversely impact our operating results and impair our ability to grow.

210. The statements identified in Paragraph 209 above were materially misleading when made because they omitted that Gemini then considered its executive team, other than the Winklevoss Defendants, to be non-essential, as evidenced by the fact that Beard, Chen, and Meade were summarily terminated months later.

211. The Registration Statement further disclosed that Beard and Meade participated in the Gemini Space Station Senior Executive Severance Plan, and Chen in the Gemini Space Station Executive Severance Plan, and that the purpose of those plans was to "help retain qualified Eligible Executives [ ], maintain a stable work environment and provide economic security."

212. The statements identified in Paragraph 211 above were materially misleading when made because they gave the misleading impression that Gemini's strategy was to maintain its executive team, rather than terminate executive team members to consolidate power with the

Winklevoss Defendants, as evidenced by the fact that Beard, Chen, and Meade were summarily terminated months later.

213. The Registration Statement stated, under "Key Factors Affecting Our Performance":

> We expect competition across our products and services to further intensify in the future as existing and new competitors introduce new products and services or enhance their value propositions for customers. As the industry matures, fee pressures may emerge over time. We intend to continue innovating to drive new products and services while delivering a premier user experience and maintaining our position as a trusted brand in the crypto space to offset the effects of these competitive pressures.

214. The statements identified in Paragraph 213 above were materially false and misleading when made because: (a) fee pressures had already "emerge[d]" and been quantified, including a 61% blended take-rate decline over eighteen months, and, by Gemini's own quantification, approximately $13.5 million of exchange revenue erased by lower blended retail fee rates in FY2024 as compared to FY2023, and a further $7.2 million erased in the first half of 2025 as compared to the first half of 2024; and (b) first-half 2025 exchange revenue fell 14% on 49% volume growth.

## III. <u>The Registration Statement Omitted Information Required Pursuant to Items 105 and 303</u>

215. Pursuant to Item 3 of Form S-1, the Registration Statement was required to furnish the information required by Item 105 of Regulation S-K, which requires the registrant to disclose, among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.105. Item 105 also required that Defendants "[e]xplain how the risk affects the issuer or the securities being offered" and discouraged framing risks "generically." However, the Registration Statement failed to disclose information regarding material risks pursuant to Item 105. The disclosures in the Registration Statement therefore failed to adequately alert investors to the actual risks associated with an investment in Gemini.

216. As set forth in Paragraphs 193-214, the Registration Statement omitted material information regarding: (a) Gemini's international businesses being reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans, without which they could not survive; (b) the growing undisclosed subsidies that were crippling Gemini; (c) Gemini's failure to develop the infrastructure and political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products; (d) Gemini's executive team, other than the Winklevoss Defendants, was considered to be non-essential; and (e) that the Winklevoss Defendants, who dominated Gemini, were then considering terminating all other members of the C-Suite. As a result, the Securities Act Defendants had a duty to disclose these currently known, adverse factors that made the IPO risky. Defendants failed to disclose the reality of Gemini's international operations and gave no meaningful indications of the Company's real vulnerability to a downturn in Bitcoin. Because the Registration Statement failed to make the requisite disclosures, the Securities Act Defendants violated Item 105.

217. Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Such disclosures are required to be made by an issuing company in registration statements filed in connection with public stock offerings.

218. In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the

> registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

219. Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

220. As set forth in Paragraphs 193-214, the Registration Statement omitted material information regarding: (a) Gemini's international businesses being reliant on undisclosed intragroup top-up payments and other subsidies, including interest-free loans, without which they could not survive; (b) the growing undisclosed subsidies that were crippling Gemini; (c) Gemini's failure to develop the infrastructure and political inroads necessary to transform the existing international businesses to actual crypto exchange operations rather than mere distributors for US products; (d) Gemini's executive team, other than the Winklevoss Defendants, was considered to be non-essential; and (e) that the Winklevoss Defendants, who dominated Gemini, were then considering a housecleaning of the non-Winklevoss members of the C-Suite. As a result, the Securities Act Defendants had a duty to disclose these currently known, adverse factors that made

the IPO risky. Defendants failed to disclose the reality of Gemini's international operations and gave no meaningful indications of the Company's real vulnerability to a downturn in Bitcoin. Because the Registration Statement failed to make the requisite disclosures, the Securities Act Defendants violated Item 303.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

**(Applicable to All Claims Except Where Noted)**

221. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of two classes:

(a) Exchange Act Class: A class consisting of all persons or entities that purchased or otherwise acquired Gemini Class A common stock between September 12, 2025 and February 17, 2026, both dates inclusive (the "Exchange Act Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder; and

(b) Securities Act Class: A class consisting of all persons and entities that purchased Gemini Class A common stock pursuant to or traceable to the Registration Statement upon which the Company went public on September 12, 2025, consisting of the Form S-1 initially filed with the SEC on August 15, 2025, and amendments filed on Form S-1/A dated August 21, 2025, September 2, 2025, September 9, 2025, and September 10, 2025 (collectively, the "Registration Statement"), or of the Form S-8 that extended the Registration Statement to certain employee incentive shares. The Securities Act Class asserts violations under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). These claims are based on

Defendants' strict liability and/or negligence, and do not assert that Defendants acted fraudulently.

222. Excluded from both classes are all Defendants herein, current and former directors, officers, and managers of Gemini (or any subsidiary, predecessor or successor thereof), the immediate family members of any excluded person, and any entity in which any excluded person owns or controls at least a 10% position.

223. The members of each Class are so numerous that joinder of all members is impracticable.

(a) Exchange Act Class: Throughout the Exchange Act Class Period, Gemini Class A common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. A Gemini Form 10-K filed shortly after the Exchange Act Class Period states: "As of March 30, 2026, there were 114 registered holders of record of our Class A common stock …. Since many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders." Record owners and other members of the Class may be identified from records maintained by Gemini or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

(b) Securities Act Class: Over 15 million shares were offered through more than a dozen underwriters. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Gemini, the Underwriter Defendants, and Gemini's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

224. Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

225. Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Classes.

226. Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.

227. Among the questions of law and fact common to the Securities Act Class are:

- whether the Registration Statement contained material misrepresentations in violation of Section 11 of the Securities Act;
- whether the Registration Statement contained material omissions in violation of Section 11 of the Securities Act, including both the omission of material necessary to make any statement therein not misleading under the circumstances in which it was made, and information required to be provided by Regulation S-K;
- whether the Director Defendants and Underwriter Defendants have any due diligence defense for such misrepresentations and omissions;

- whether Tyler and Cameron Winklevoss operated as control persons of Gemini with respect to the Registration Statement and IPO; and
- whether Defendants can substantiate any affirmative defense proving that the decline in the price of Gemini between the IPO and the filing of the lawsuit was caused in part or in whole by a cause other than that alleged herein.

228. Among the questions of law and fact common to the Exchange Act Class are:

- whether the Exchange Act Defendants made material misrepresentations or omissions in the Exchange Act Class Period;
- whether such misrepresentations or omissions were made either intentionally or recklessly;
- whether such misrepresentations or omissions caused investor loss;
- whether the prices of Gemini securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- the appropriate measure of damages.

229. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

230. For the Exchange Act Class, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Gemini securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Exchange Act Class purchased or otherwise acquired Gemini Class A common stock between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

231. Alternatively, for the Exchange Act Class, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Exchange Act Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

**(Applicable Only to Exchange Act Claims)**

232. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pled in this Complaint. The statements complained of herein were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

233. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting the Exchange Act

Defendants' statements, any generalized risk disclosures made by the Exchange Act Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

234. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## CONTROL PERSON ALLEGATIONS
### (Applicable to All Claims Except Where Noted)

235. The Winklevoss Defendants, by virtue of their high-level positions with, voting control over, and financial dominance of the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, including its business, operations, earnings, revenue, and demand for its products. The Winklevoss Defendants participated in the drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

236. The Winklevoss Defendants, as co-founders, directors, senior executive officers, and financiers of the Company, as well as owners of the controlling block of Class B shares, were able to and did control the content of the various SEC filings, press releases, and other public statements issued by or on behalf of Gemini during the Class Period. The Winklevoss Defendants

were provided copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Winklevoss Defendants are responsible for the accuracy of the public statements detailed herein.

237. The Winklevoss Defendants, because of their positions of control and authority as co-founders, directors, and senior executive officers had access to adverse undisclosed information about Gemini's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

238. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Winklevoss Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Gemini's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Gemini common stock would be based upon truthful and accurate information. The Winklevoss Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

239. In making the statements complained of herein, the Winklevoss Defendants, who were senior officers and controlling persons of Gemini, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Winklevoss Defendants is attributable to the Company.

## CLAIMS FOR RELIEF

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against the Exchange Act Defendants)

240. Plaintiffs repeat and re-allege all Paragraphs above, other than those specified as applying only to the Securities Act Claims, as if fully set forth herein.

241. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

242. As alleged above, during the Class Period, the Exchange Act Defendants made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of securities. These misstatements and omissions were intended to, and, throughout the Exchange Act Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gemini securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Gemini securities and options at artificially inflated prices. The Exchange Act Defendants, and each of them, took the actions set forth herein.

243. Each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement, quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Gemini securities. Such reports, filings, releases and statements were materially false and misleading in

that they failed to disclose material adverse information and misrepresented the truth about Gemini's finances and business prospects.

244. By virtue of their positions and responsibilities at Gemini, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Exchange Act Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

245. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the co-founders, directors and dominant managers over Gemini's day-to-day operations, Tyler and Cameron Winklevoss had knowledge of the details of Gemini's internal affairs alleged herein.

246. Tyler and Cameron Winklevoss are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, they were able to and did, directly or indirectly, control the content of the statements of Gemini. As officers and directors of a publicly held company, Tyler and Cameron Winklevoss had a duty to disseminate timely, accurate, and truthful information with respect to Gemini's businesses, operations, future financial condition, and prospects. As a result of the dissemination of the aforementioned false and

misleading reports, releases, and public statements, the market price of Gemini securities was artificially inflated throughout the Exchange Act Class Period. In ignorance of the adverse facts concerning Gemini's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Gemini securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

247. During the Exchange Act Class Period, Gemini securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gemini securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other members of the Exchange Act Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Exchange Act Class, the true value of Gemini securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Gemini securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Exchange Act Class members.

248. By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

249. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, when the truth concealed by Defendants' misrepresentations and omissions, including that Gemini's touted international operations were sustained only by undisclosed intragroup subsidies and were slated for termination rather than expansion, and that Gemini was terminating the majority of the executive team described to investors as key persons so that it could consolidate power with Tyler and Cameron Winklevoss, was revealed.

**COUNT II**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against the Exchange Act Defendants)**

250. Plaintiffs repeat and re-allege each and every allegation contained in all Paragraphs above, other than those specified as applying only to the Securities Act Claims, as if fully set forth herein.

251. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

252. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Exchange Act Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gemini

securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Gemini securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

253. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Gemini securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Gemini's finances and business prospects.

254. By virtue of their positions at Gemini, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Exchange Act Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

255. While the misrepresentations and omissions alleged herein were a necessary and important part of the scheme, the scheme also involved substantial additional conduct by the

Exchange Act Defendants including: (a) the investment in and use of political influence to speed their IPO to market just as crypto prices were peaking; (b) the repayment by Gemini of loans to Galaxy so that collateral could be returned to WCF for the personal benefit of the Winklevoss Defendants; (c) the return of hundreds of millions of dollars' worth of previously locked up crypto that was owned by WCF but pledged as collateral for the Galaxy loans; (d) converting other loans by WCF into Class B super-voting stock to maintain the Winklevoss Defendants' control; and (e) responding to the SEC's request that additional information be provided about the repayment of loans by making the use of proceeds language in the Registration Statement more vague, rather than indicating that the IPO proceeds would be used to repay Galaxy so that WCF could get its collateral back and quantifying the interest rates thereby avoided, as the SEC requested.

256. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the co-founders, directors and dominant managers over Gemini's day-to-day operations, Tyler and Cameron Winklevoss had knowledge of the details of Gemini's internal affairs alleged herein.

257. Tyler and Cameron Winklevoss are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, they were able to and did, directly or indirectly, control the content of the statements of Gemini. As officers and directors of a publicly held company, Tyler and Cameron Winklevoss had a duty to disseminate timely, accurate, and truthful information with respect to Gemini's businesses, operations, future financial condition, and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Gemini securities was artificially inflated throughout the Exchange Act Class Period. In ignorance of the adverse facts

concerning Gemini's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Gemini securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

258. During the Exchange Act Class Period, Gemini securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gemini securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other members of the Exchange Act Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Exchange Act Class, the true value of Gemini securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Gemini securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Exchange Act Class members.

259. By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

260. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, when the

truth concealed by Defendants' misrepresentations and omissions, including that Gemini's touted international operations were sustained only by undisclosed intragroup subsidies and were slated for termination rather than expansion, and that Gemini was terminating the majority of the executive team described to investors as key persons so that it could consolidate power with Tyler and Cameron Winklevoss, was revealed.

**COUNT III**

**(Violations of Section 20(a) of the Exchange Act Against Tyler and Cameron Winklevoss)**

261. Plaintiffs repeat and re-allege each and every allegation contained in all Paragraphs above, other than those specified as applying only to the Securities Act Claims, as if fully set forth herein.

262. During the Class Period, the Winklevoss Defendants participated in the operation and management of Gemini, and conducted and participated, directly and indirectly, in the conduct of Gemini's business affairs. Because of their senior positions, they knew the adverse non-public information concealed from investors, including that Gemini's international operations were sustained only by undisclosed intragroup top-up payments and other subsidies, and that Gemini was poised for an expensive and disruptive restructuring that would include exiting its international markets and overhauling its executive team.

263. As officers and/or directors of a publicly owned company, the Winklevoss Defendants had a duty to disseminate accurate and truthful information with respect to Gemini's financial condition and results of operations, and to correct promptly any public statements issued by Gemini which had become materially false or misleading.

264. Because of their positions of control and authority as senior officers, the Winklevoss Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Gemini disseminated in the marketplace during the Class Period concerning

Gemini's results of operations. Throughout the Class Period, the Winklevoss Defendants exercised their power and authority to cause Gemini to engage in the wrongful acts complained of herein. The Winklevoss Defendants, therefore, were "controlling persons" of Gemini within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Gemini securities.

265. Each of the Winklevoss Defendants, therefore, acted as a controlling person of Gemini. By reason of their senior management positions and/or being directors of Gemini, each of the Winklevoss Defendants had the power to direct the actions of, and exercised the same to cause, Gemini to engage in the unlawful acts and conduct complained of herein. Each of the Winklevoss Defendants exercised control over the general operations of Gemini and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

266. By reason of the above conduct, the Winklevoss Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Gemini.

## COUNT IV

## (Violations of Section 11 of the Securities Act Against Gemini, the Director Defendants, and the Underwriter Defendants)

267. Plaintiffs repeat and re-allege each and every allegation contained in all Paragraphs above, other than the Exchange Act Claims and those allegations specified as applying only to the Exchange Act Claims, as if fully set forth herein.

268. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Gemini, the Director Defendants, and the Underwriter Defendants. This Count is based on strict liability and does not sound in fraud. Any allegations of fraudulent conduct or motive are expressly excluded from this Count.

269. This Count is asserted against the Company, the Director Defendants, and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Securities Act Class who purchased or otherwise acquired Gemini Class A common stock pursuant to or traceable to the Registration Statement.

270. The Registration Statement which these Defendants used to sell shares to the public for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

271. As issuer of the shares, Gemini is strictly liable to Plaintiffs and the Securities Act Class for the misstatements and omissions in the Registration Statement.

272. The Director Defendants each were signatories to the Registration Statement and each consented to be named as a director of the issuer in the Registration Statement. Consequently, each is liable to Plaintiffs and the Securities Act Class for the misstatements and omissions in the Registration Statement.

273. The Underwriter Defendants each agreed to underwrite the IPO and to be identified as underwriters in the Registration Statement. Consequently, the Underwriter Defendants are liable to Plaintiffs and the Securities Act Class for the misstatements and omissions in the Registration Statement.

274. The Registration Statement made clear that all shares other than those registered by the Registration Statement were locked up for a period of 180 days following the IPO, so all shares purchased by Plaintiffs and the Securities Act Class during the period are traceable to the Registration Statement, stating that:

> shares of Class A common stock sold in this offering will be freely tradable in the public market without restriction or further registration under the Securities Act,

> unless these shares are held by "affiliates," as that term is defined in Rule 144 under the Securities Act. The remaining outstanding shares of our Class A common stock will be deemed "restricted securities" as that term is defined under Rule 144…. As a result of the lock-up agreements described below and the provisions of Rules 144 or 701, all of the shares of our Class A common stock that will be deemed "restricted securities" will be available for sale in the public market beginning 180 days after the date of this prospectus.[3]

275. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

276. By reasons of the conduct herein alleged, each Securities Act Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

277. Plaintiffs and the Class have sustained damages. The value of Gemini common stock has declined substantially between the IPO and the filing of this lawsuit, and there is no proof that the decline was attributable to causes other than the alleged inaccuracies. To the contrary, the fact that GEMI stock declined more than Bitcoin itself or other crypto brokers suggests that there is no negative causation.

## COUNT V

## (Violations of Section 15 of the Securities Act Against Tyler and Cameron Winklevoss)

278. Plaintiffs repeat and re-allege each and every allegation contained in all Paragraphs above, other than the Exchange Act Claims and those allegations specified as applying only to the Exchange Act Claims, as if fully set forth herein.

[3] As a result, Plaintiffs do not believe that any of the shares identified in the Form S-8 were traded during that 180-day lock-up period. However, to the extent any were, such shares are equally part of the Securities Act Class and claims, are equally traceable to the Registration Statement, and Securities Act Defendants are equally liable therefor because all of the substantive disclosures in the Form S-8 were simply incorporated by reference to the Registration Statement and Prospectus.

279. This Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

280. This Count is asserted against Tyler and Cameron Winklevoss and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

281. In addition to their own primary liability alleged in Count I, Tyler and Cameron Winklevoss are secondarily liable for Gemini's primary violations as control persons of Gemini. Tyler and Cameron Winklevoss were the co-founders of Gemini and dominated the day-to-day operations of Gemini, as well as its board and strategic decisions. By virtue of their roles and acts, the Winklevoss Defendants were at all times relevant hereto controlling persons of Gemini within the meaning of Section 15 of the Securities Act.

282. The Winklevoss Defendants had the power and influence and exercised the same to cause Gemini to engage in the acts described herein. They could have caused Gemini to issue a registration statement that was accurate, complete and not misleading, either by requiring that inaccuracies and omissions be cured or by withholding signature or postponing the IPO until such deficiencies were cured.

283. By virtue of the conduct alleged herein, the Winklevoss Defendants are liable for the aforesaid wrongful conduct of Gemini and are liable to Plaintiffs and the Class for statutory damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Classes by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Classes prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: August 21, 2026

Respectfully submitted,

KAHN SWICK & FOTI, LLC

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
230 Park Avenue, 3rd Floor West
New York, NY 10169
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

Craig J. Geraci, Jr.*
Matthew P. Woodard*
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Email: craig.geraci@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Class*

POMERANTZ LLP

*/s/ Joshua B. Silverman*
Joshua B. Silverman (*pro hac vice*)
Genc Arifi (*pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
jbsilverman@pomlaw.com
garifi@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Class and Counsel for Additional Named Plaintiff*

HAO & HAN LAW FIRM
Junbo Hao
12B05, Tower A
Ocean Express Building
Chaoyang District, Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Yang Qin*